Aaron Teitelbaum (SBN 298135)
aaron@kressinpowers.com
Andrew Chang (SBN 319009)
andrew@kressinpowers.com
**KRESSIN POWERS LLC**
400 Seventh Avenue NW, Suite 300
Washington, DC 20004
Telephone: (202) 922-5962

*Counsel for Plaintiff Aptoide, S.A.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APTOIDE, S.A.<br><br>               Plaintiff,<br><br>     v.<br><br><br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>               Defendants. | CASE NO. 26-cv-3165<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

PLAINTIFF'S COMPLAINT

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1

PARTIES ............................................................................................................................... 5

JURISDICTION AND VENUE ............................................................................................. 6

DIVISIONAL ASSIGNMENT .............................................................................................. 8

FACTUAL ALLEGATIONS .................................................................................................. 8

    I.      THE MERCHANT MARKET FOR MOBILE OPERATING SYSTEMS ................ 10

        A. MARKET DEFINITION .......................................................................................... 10

            1.  Product Market .................................................................................................... 10

            2.  Geographic Market ............................................................................................. 11

        B. MONOPOLY POWER .............................................................................................. 11

    II.     THE MARKETS FOR GENERAL SEARCH SERVICES AND SEARCH
           ADVERTISING ........................................................................................................ 13

        A.   MARKET DEFINITION .......................................................................................... 14

        B.   MONOPOLY POWER/MARKET POWER ............................................................ 15

        C.   ANTICOMPETITIVE CONDUCT AND EFFECTS ............................................. 16

    III.    THE ANDROID APP DISTRIBUTION MARKET ................................................... 17

        A. MARKET DEFINITION .......................................................................................... 18

            1.  Product Market .................................................................................................... 18

            2.  Geographic Market ............................................................................................. 19

        B. MONOPOLY POWER .............................................................................................. 20

        C. ANTICOMPETITIVE CONDUCT ......................................................................... 21

            1.  Conduct Relating to OEMs .............................................................................. 21

            2.  Conduct Relating to Mobile Network Operators (MNOs) ............................ 24

            3.  Conduct Relating to App Developers ............................................................. 25

            4.  Conduct Relating to Competing App Stores ................................................. 31

            5.  Conduct Relating to App Users ...................................................................... 32

PLAINTIFF'S COMPLAINT

D. ANTICOMPETITIVE EFFECTS ................................................................................ 40

IV. THE ANDROID IN-APP BILLING MARKET ............................................................. 41

A. MARKET DEFINITION................................................................................ 42

1. Product Market ................................................................................ 42

2. Geographic Market ......................................................................... 43

B. MONOPOLY POWER ................................................................................ 43

C. ANTICOMPETITIVE CONDUCT................................................................ 44

D. ANTICOMPETITIVE EFFECTS ................................................................ 46

V. RELATED LAWSUITS BY THE UNITED STATES, STATE ATTORNEYS GENERAL, AND PRIVATE PARTIES................................................................... 47

COUNT I: Sherman Act § 2 (Monopoly Maintenance in the Market for Android App Distribution) ..................................................................................................................... 50

COUNT II: Sherman Act § 1 (Unreasonable Restraints of Trade in the Market for Android App Distribution Relating to OEMs) ......................................................................... 51

COUNT III: Sherman Act § 1 (Unreasonable Restraints of Trade in the Market for Android App Distribution Relating to the Developer Distribution Agreement) ................................... 52

COUNT IV: Sherman Act § 1 (Unreasonable Restraints of Trade in the Market for Android App Distribution Relating to Other Agreements with Developers, Including Project Hug, the Games Velocity Program, and the Apps Velocity Program)................................................ 54

COUNT V: Sherman Act § 1 (Reciprocal Dealing Across the Market for General Search Services and the Market for Android App Distribution) ........................................................... 55

COUNT VI: Sherman Act § 1 (Reciprocal Dealing Across the Market for Search Advertising and the Market for Android App Distribution) ...................................................................... 57

COUNT VII: Sherman Act § 2 (Monopolization and Monopoly Maintenance in the Market for Android In-App Billing)........................................................................................ 58

COUNT VIII: Sherman Act § 1 (Unreasonable Restraints of Trade in the Market for Android In-App Billing Relating to the Developer Distribution Agreement) ................................... 59

PLAINTIFF'S COMPLAINT

COUNT IX: Sherman Act § 1 (Tying Google Play Store in the Market for Android App Distribution to Google Play Billing in the Market for Android In-App Billing) ........................... 61

COUNT X: California Cartwright Act (Unreasonable Restraints of Trade in the Market for Android App Distribution Relating to OEMs) .................................................................. 62

COUNT XI: California Cartwright Act (Unreasonable Restraints of Trade in the Market for Android App Distribution Relating to the Developer Distribution Agreement) ........................... 64

COUNT XII: California Cartwright Act (Reciprocal Dealing Across the Market for General Search Services and the Market for Android App Distribution) ...................................................... 65

COUNT XIII: California Cartwright Act (Reciprocal Dealing Across the Market for Search Advertising and the Market for Android App Distribution) .......................................................... 67

COUNT XIV: California Cartwright Act (Unreasonable Restraints of Trade in the Market for Android In-App Billing Relating to the Developer Distribution Agreement) ............................... 69

COUNT XV: California Cartwright Act (Tying Google Play Store in the Market for Android App Distribution to Google Play Billing in the Market for Android In-App Billing) .......................... 70

COUNT XVI: California Unfair Competition Law (Unlawful Conduct) .................................... 72

PRAYER FOR RELIEF ................................................................................................ 73

DEMAND FOR JURY TRIAL ........................................................................................ 73

PLAINTIFF'S COMPLAINT

**PRELIMINARY STATEMENT**

1.    App stores are the gateways to the digital mobile app economy.  For billions of mobile device users worldwide, app stores determine which apps a user can discover, the means through which developers and users transact, and ultimately, which apps succeed or fail.  In short, app stores control the commercial relationship between developers and users.  Control over that infrastructure determines whether competition in the mobile app ecosystem can occur at all.

2.    After 15 days of trial in *Epic Games, Inc. v. Google LLC* ("*Epic v. Google*"), a jury found that there is a relevant market for **Android App Distribution**, and that Google willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct. Both the District Court judge overseeing the trial and the Ninth Circuit upheld the jury's verdict. *See In re Google Play Store Antitrust Litig.*, 2024 WL 3302068, at *1 (N.D. Cal. July 3, 2024); *In re Google Play Store Antitrust Litig.*, 147 F. 4th 917, 930 (9th Cir. 2025).

3.    Google's dominant position in the Android App Distribution market—a monopoly share of over 90% protected by significant barriers to entry, according to data through 2022—was not the result of competition on the merits.  It arose from Google's deliberate, multi-pronged strategy to maintain its monopoly over this critical gateway, suppress rival app stores, and extract supracompetitive fees from developers and users.  *See* ECF No. 606, *In re Google Play Store Antitrust Litig.* (N.D. Cal. No. 20-cv-05671) ("Epic Verdict Sheet"), at 2-3.

4.    Google attacked competition at every level of the Android ecosystem.  Google used Mobile Application Distribution Agreements ("MADAs") and Revenue Sharing Agreements ("RSAs") with manufacturers of Android phones to secure preferential placement for Google Play and punish any attempts to give its competitors comparable treatment—conduct which, according to data obtained by the Competition & Markets Authority as well as the *Google Search* remedies-phase record, continued through at least 2024.  It reinforced those restrictions through side deals with major app developers designed to keep them in the Play ecosystem and prevent rival stores from gaining traction.  It raised technical and contractual barriers that continue today to prevent rival app stores from achieving meaningful distribution on Android devices.  And it deliberately engineered the user experience of installing apps from outside Google Play to be onerous and often

PLAINTIFF'S COMPLAINT

prohibitive, forcing users still today to overcome numerous warning screens, security prompts, and multi-step hurdles before downloading an app through a competing channel.

5. Not content with maintaining its monopoly in the market for Android App Distribution, Google used its dominance in that market to acquire and maintain a monopoly in a separate market for in-app billing services for apps in the Android ecosystem. Until at least 2025, Google conditioned developers' access to the Google Play Store on their exclusive use of Google's proprietary in-app billing system, Google Play Billing. Google's coercive policies insulated Google Play Billing from price and quality competition and allowed Google to impose supracompetitive prices that developers could not avoid without losing access to Android users altogether. Presented with this evidence, the *Epic v. Google* jury likewise found—and the Ninth Circuit likewise affirmed—that there exists a relevant market for **Android In-App Billing Services for Digital Goods and Services Transactions** (the **"Android In-App Billing Market"**), and that Google willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct. *See* Epic Verdict Sheet at 2-3.

6. Google's unlawful monopolies in the Android App Distribution Market and in the Android In-App Billing Market did not arise in isolation. Those monopolies are flanked by Google's adjacent monopoly in the market for **General Search Services**, which was found after a trial lasting over two months to be a relevant market in which Google had monopoly power and engaged in anticompetitive conduct. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118, 136 (D.D.C. 2024) ("*Google Search*"). Google used its mutually-reinforcing monopoly in this market to secure its dominant position in the markets for Android App Distribution and Android In-App Billing in at least two ways.

7. *First*, as discussed above, Google entered into MADAs and RSAs with every major manufacturer of Android phones, offering them extortionately lucrative shares of its monopoly profits in the General Search Services market in exchange for their agreement to preference the Google Play Store over competing app stores. In *Google Search*, the district court found that the MADAs and RSAs were anticompetitive agreements to maintain Google's general-search monopoly because they required manufacturers to preinstall Google Search as the default search

PLAINTIFF'S COMPLAINT

2

engine for those devices' search access points.  747 F. Supp. 3d at 99-100.  In *Epic v. Google*, those very same agreements were determined to serve a dual purpose in the Android App Distribution market: not only did they require preinstallation and preferencing of the Google Play Store, but Google was able to use the monopoly profits it generated from its Google Search business to buy off Android device manufacturers so they would refuse Google's app-store competitors comparable treatment.

8.      ***Second***, knowing that it held a monopoly product in the General Search Services market, Google conditioned app developers' ability to advertise their apps through one-tap installations on the Google Search results page on those developers distributing their apps through the Google Play Store.  For example, because apps like Spotify are distributed through Google Play, a user searching for the "Spotify" app on Google Search can download that app from Google Play by simply tapping an icon on the search results page.  But if Spotify were to instead distribute its app through a competing app store, a user searching for "Spotify" on Google Search would see nothing but a link to the Spotify website.  In sum, app developers may either distribute their apps through Google Play in order to access the vast audience of Android users searching for apps through Google Search, or distribute elsewhere and forego any meaningful visibility to those users.

9.      None of this is defensible as competition on the merits.  There is no procompetitive rationale for Google's use of monopoly profits from its Search monopoly to purchase Android manufacturers' compliance, conditioning critical revenue streams on the preloading and preferential placement of Google Play.  Nor is there any justification for Google's self-preferencing of Google Play on Google Search, forcing app developers to either distribute through Google Play or give up the ability to convert users of Google's monopoly general-search product through streamlined one-tap downloads.  This scheme does not improve products, reduce costs, or create efficiencies that benefit customers.  It exists to protect and extend Google's monopoly power across adjacent markets by suppressing distribution alternatives and insulating Google Play from competitive pressure.

10.      This case sits at the heart of this interrelated web of adjacent monopolies, each of which Google was found to have unlawfully acquired or maintained.  Plaintiff Aptoide, S.A. ("Aptoide") is the world's leading independent Android app store.  Notwithstanding Google's

PLAINTIFF'S COMPLAINT

anticompetitive chokehold over the Android App Distribution and Android In-App Billing Markets, Aptoide has managed to build one of the most successful and fastest-growing app distribution platforms globally, particularly in the distribution of mobile games. Founded in 2011, Aptoide reached its first million users in 2013; by 2024, only a decade later, it had reached over 200 million direct yearly users. Aptoide is presently the third-largest Android store in the world, with a catalog of approximately 436,000 unique apps.

11. For over a decade, Aptoide has provided users and developers a genuine competitive alternative to Google Play and Google Play Billing. It offers developers lower commissions, users lower payment costs, and app users across the ecosystem greater consumer choice. Aptoide has over 10 partner stores globally and has built an extensive content-delivery-network infrastructure around the world to optimize fast, secure downloads for users across multiple countries. It also has partnerships and connections with major U.S. network carriers (such as AT&T, Verizon, and T-Mobile), through which it has been able to achieve success in reaching users at the point of mobile-device purchase.

12. Aptoide has demonstrated both the incentive and the capability to compete with Google on the merits. But for Google's monopolies in the Android App Distribution and Android In-App Billing Markets—and the exclusionary practices Google uses to protect them—Aptoide would have exerted substantially more competitive pressure on Google's pricing and policies. Instead, Google successfully suppressed that competition, foreclosing Aptoide from crucial access channels at the outset and preventing it from realizing the benefits of fair competition that the antitrust laws are designed to protect.

13. Aptoide thus brings claims under Sections 1 and 2 of the Sherman Act, as well as under California's Cartwright Act and Unfair Competition Law ("UCL"), to challenge Google's unlawful agreements within, and monopolization of, two key Android commerce channels: (i) the Android App Distribution Market, and (ii) the Android In-App Billing Market. Aptoide seeks damages and injunctive relief necessary to dismantle the restraints that insulate Google Play and Google Play Billing from competitive pressure and end Google's scheme to control how Android users discover, download, and pay for apps.

PLAINTIFF'S COMPLAINT

**PARTIES**

14.     Plaintiff Aptoide, S.A., is a company incorporated in Portugal with its principal place of business in Lisbon, Portugal.  Founded in 2011, Aptoide operates an independent app distribution platform—the Aptoide Store—that allows Android users to discover and download mobile applications. Aptoide also offers in-app payment solutions that allow developers to monetize Android apps distributed through Aptoide.  Aptoide has since grown into one of the largest competitors to the Google Play Store, reporting a global user base exceeding 200 million direct yearly users and an app catalog of approximately 436,000 unique apps.

15.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and therefore is a party to the anticompetitive contractual restrictions at issue in this Complaint.

16.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

17.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

18.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts

PLAINTIFF'S COMPLAINT

with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

19. Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and, as of the date of this filing, collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over Aptoide's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Aptoide's state-law claims pursuant to 28 U.S.C. § 1367. The Court also has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of Plaintiff, on the one hand, and of Defendants, on the other, and the amount in controversy exceeding $75,000.

21. This Court has personal jurisdiction over each of the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.

22. The Defendants also have consented to this Court's exercise of personal jurisdiction. Each of the Defendants except Google Payment is a party to the Google Play Developer Distribution Agreement (the "DDA") that sets forth the terms and conditions under which developers may list their apps on Google Play. According to the current version of the DDA published by Google on its website (dated September 2025), Section 16.8 provides that the parties will "agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California to resolve any legal matter arising from or relating to this Agreement." Section 16.8 further provides that "[a]ll claims arising out of or relating to this Agreement or Your relationship

PLAINTIFF'S COMPLAINT

6

with Google under this Agreement will by governed by the laws of the State of California, excluding California's conflict of laws provisions." The claims addressed in this Complaint relate to the DDA and its impacts on Aptoide as a competing app store, or in the alternative, such claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over each Defendant, so that the exercise of pendent personal jurisdiction would be proper.

23. Google Payment is a party to the Google Payment—Terms of Service—Seller Agreement, which sets forth the terms and conditions under which developers use Google Play's in-app billing services. According to the most recent public version of this agreement published by Google on its website (dated March 2023), Section 11.3 provides that "[t]he exclusive venue for any dispute related to this Agreement will be the state or federal courts located in Santa Clara County, California, and each party consents to personal jurisdiction in these courts." Section 11.3 further provides that "[t]he laws of California, excluding California's choice of law rules, and applicable federal United States laws will govern this Agreement." The dispute between Google Payment and Aptoide relates to the impact of the Google Payment Seller Agreement on Aptoide, or in the alternative, Aptoide's claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over Google Payment, so that the exercise of pendent personal jurisdiction would be proper.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Aptoide's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

PLAINTIFF'S COMPLAINT

7

## DIVISIONAL ASSIGNMENT

25.    Civil Local Rule 3-2(c) does not provide the basis for assignment to a particular Division of this District.  However, pursuant to Civil Local Rule 3-12(a)(1)-(2), this case is related to *Epic v. Google* (N.D. Cal. No. 3:20-cv-5671-JD), which was consolidated into *In re Google Play Store Antitrust Litigation* (N.D. Cal. No. 3:21-md-2981-JD), because it concerns substantially the same parties, property, transactions, or events, and there will be an unduly burdensome duplication of labor and expense or conflicting results if this case is conducted before a different judge.

## FACTUAL ALLEGATIONS

26.    Plaintiff Aptoide, S.A. is a Portuguese public limited company headquartered in Lisbon, Portugal.  Founded in 2011, Aptoide provides consumers and developers alike a meaningful alternative to dominant, closed app store ecosystems.  Aptoide's flagship product is the Aptoide Store, a free and independent app distribution platform for Android that allows users to not only download and install apps, but also to operate their own app stores.

27.    An "independent" app store is an app distribution platform that is not controlled by an upstream firm in the mobile ecosystem—*e.g.*, the Samsung Galaxy Store (which is controlled by Samsung, an Android device manufacturer), the Verizon App Manager (which is controlled by Verizon, a wireless carrier), or Google Play (which is controlled by Google, who owns the Android OS).  Because non-independent app stores are controlled by firms that also compete with app developers (for example, Google distributes YouTube, which competes with other video-sharing apps, within Google Play) and thus profit from steering users toward their own apps and services, they often have incentives to impose restrictive distribution terms for the apps they do not own.  Independent app stores lack those adverse incentives.  Their success depends on attracting developers and users by offering competitive pricing, fair terms of distribution, flexibility in payment processing, and broader choice.  In other words, their interests are aligned with those of developers seeking open access to users, and users seeking greater innovation and lower prices.

28.    In the late 2000s and early 2010s, developers and industry observers increasingly recognized that apps distributed through vertically-integrated app stores (like Google Play) faced significant visibility issues, especially when they competed with the store operator's own proprietary

PLAINTIFF'S COMPLAINT

apps. Aptoide was created to meet the growing demand for a legitimate alternative distribution channel. In 2009, two years before its incorporation, Aptoide launched an open-source version of what would become the Aptoide Store, reflecting its early commitment to independent competition in mobile app distribution. Since then, Aptoide has become the fastest-growing app distribution platform in the world, serving more than 200 million direct yearly users worldwide and hosting a robust app catalog of approximately 436,000 unique apps with over 7 billion historical downloads in total. Aptoide has a substantial presence in the United States, generating approximately $18.5 million in U.S. revenue in 2025 from a domestic userbase of nearly a million monthly active users.

29.     Aptoide provides a suite of products designed to broaden distribution options and reduce the costs imposed by dominant platforms. For example, in addition to the user-facing Aptoide Store, Aptoide also offers Aptoide Connect (formerly "Catappult"), the developer-facing side of the Aptoide Store that enables developers to integrate and monetize their apps across the Aptoide Store and over 10 partner app stores.

30.     Aptoide Connect includes an in-app billing solution supporting a wide array of payment methods for in-app transactions, including credit card, Amazon Pay, PayPal, and local payment options tailored to specific regions. Aptoide Connect offers developers the industry's most favorable revenue splits on these transactions, permitting them to keep up to 90% of the revenue for in-app purchases processed through Aptoide's in-app billing software.

31.     Aptoide also offers the Aptoide Wallet (formerly "AppCoins"), a separate application and web interface integrated with its in-app billing software that offers users discounts of up to 20% on in-app purchases. Users of the Aptoide Wallet are able to utilize multiple payment options to store a balance usable across various mobile games and applications.

32.     In 2024, Aptoide launched in Europe the first alternative app store and in-app payment solution for Apple's iOS, the operating system on which Apple's iPhones run. That launch followed Apple's implementation of changes required by the European Union's Digital Markets Act ("DMA"), which requires designated platform "gatekeepers" to, *inter alia*, (i) permit and technically enable the installation of third-party apps and third-party app stores; and (ii) allow the use of alternative payment solutions for in-app purchases.

PLAINTIFF'S COMPLAINT

## I.   THE MERCHANT MARKET FOR MOBILE OPERATING SYSTEMS

33.     Google's dominance in the Android App Distribution and Android In-App Billing Markets (together, the "Android Markets"), discussed *infra* in Parts III and IV, is rooted in its dominance in an adjacent market: the **Merchant Market for Mobile Operating Systems ("OSs")**. Although Aptoide's claims are directed at Google's anticompetitive conduct in the Android App Distribution and Android In-App Billing Markets, the foundational role that operating systems play in the smart mobile device ecosystem lends key context to the monopolies Google illegally acquired and maintained in those two markets.

### A.   MARKET DEFINITION

#### 1.   Product Market

34.     Modern smartphones and tablets ("smart mobile devices") are general-purpose computing devices.  They deliver core functionality—communications, navigation, entertainment, and commerce—through software applications that run on top of an operating system, or OS. Without a mobile OS, a smart mobile device is not meaningfully usable.  The OS supplies the basic interface and controls, manages the device's connectivity and hardware features, and enables the installation and operation of mobile apps compatible with that OS.

35.     Smart mobile devices are manufactured by original equipment manufacturers ("OEMs") like Samsung, LG, Motorola, and Nokia.  In order to be able to sell smart mobile devices that are usable by customers immediately after purchase, OEMs must pre-install OSs on each device they manufacture prior to sale.  And, because OEMs must pre-install OSs on each device, OEMs design mobile devices to ensure the device's compatibility with a particular OS the OEM chooses for a particular model of mobile device, so that the device may utilize the capabilities of that OS. Designing smartphones to be compatible with a particular OS—including engineering, integrating, and preinstalling that OS before sale—requires significant time and investment.  An OEM cannot easily switch the OS of a given model of smart mobile device without incurring prohibitively large switching costs.

36.     The vast majority of OEMs do not and cannot develop their own mobile OSs. Creating a mobile OS from scratch requires enormous and sustained investment in engineering and

PLAINTIFF'S COMPLAINT

long-term maintenance across a wide range of device configurations. A viable mobile OS must also include core functionality and compatibility layers that allow third-party apps to run reliably, and it must be updated continuously to keep pace with evolving hardware and security threats. Thus, building and maintaining a competitive mobile OS is not economically feasible for most OEMs.

37.     As a result, most OEMs must license a mobile operating system that can be preinstalled on the smart mobile devices they manufacture and sell. There thus exists a relevant Merchant Market for Mobile OSs in which the developers of mobile OSs are the sellers of OS licenses, and OEMs are buyers of those licenses. Historically, the Merchant Market for Mobile OSs has included the Android OS (developed by Google), the Tizen OS (developed by Samsung and hosted by the Linux Foundation), and the Windows Mobile OS/Windows Phone OS (developed by Microsoft). Companies that produce OSs that they use only for their own proprietary hardware—*e.g.*, Apple's iOS, available only on Apple's iPhones—do not participate in this market because they do not sell licenses to OEMs.

### 2.     Geographic Market

38.     OEMs license mobile operating systems on a worldwide basis, except in China. Google's operations in China are limited, and many of Google's mobile products and services are not offered there. Those limitations reflect legal and regulatory restrictions imposed by China on mobile-OS-related software. Moreover, although Google requires OEMs licensing Android for sale outside China to refrain from selling devices using competing Android-compatible mobile OSs, Google does not impose that same restriction on devices sold within China. The geographic scope of the Merchant Market for Mobile OSs is therefore worldwide, excluding China.

### B.     MONOPOLY POWER

39.     Google has monopoly power in the Merchant Market for Mobile OSs. Google's monopoly power in this market is apparent both indirectly through its dominant market share protected by significant barriers to entry, and directly through its power to impose draconian, lopsided requirements on licensee OEMs without regard to competitive responses by other OS licensors.

PLAINTIFF'S COMPLAINT

40.     As the European Commission determined in the course of its 2018 investigation into Android, the Android OS (which Google licenses to OEMs) comes pre-installed on over 90% of all mobile devices sold by OEMs that license a third-party OS.  Even including OEMs like Apple that *do not* license third-party OSs—and thus are not properly considered participants in the Licensing Market for Mobile OSs—Google's Android OS has a 75% market share of devices sold worldwide, excluding China.

41.     Google's dominant market share is protected by significant barriers to entry.  The Android OS benefits from substantial network effects.  Because devices, apps, and accessories must be designed to be compatible with a specific mobile OS, the Android OS has its own ecosystem of interdependent mobile products and apps that are designed to be usable only on Android.  By contrast, a new mobile OS entrant must attract consumers to a device platform that initially lacks a robust app library (as well as hardware and accessories), while simultaneously persuading software and hardware developers to build, adapt, and maintain products for a platform that initially has few users.  This chicken-and-egg problem—recognized in *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) as the "applications barrier to entry" into operating-systems markets—makes entry extremely difficult even for well-funded firms, because developers rationally prioritize platforms with large user bases, and users rationally choose platforms with the widest selection of apps and accessories.

42.     There likewise exists direct evidence of Google's monopoly power in the Merchant Market for Mobile OSs.  Google imposes stringent terms in its licensing agreements with OEMs that require, *inter alia*, that OEMs licensing the Android OS pre-install and preference the Google Play Store over other app stores.  All of Google's apps (*e.g.*, Gmail, Google Maps, YouTube, the Google Search Widget, and the Google Play Store) must be licensed as a bundle, meaning that an OEM cannot pre-install any Google apps without also pre-installing and preferencing all the others.  Despite Google's uniform imposition of this term—which precludes OEMs from entering into potentially lucrative deals with competing app stores allowing such stores to secure competitive default placements—several OEMs have nevertheless stated that other OSs are not a reasonable alternative to the Android OS.  As they explain, other mobile OSs lack the existing catalog of high-

PLAINTIFF'S COMPLAINT

quality and successful mobile apps available on Android, which consumers find invaluable in selecting a mobile device to purchase.  In other words, Google's licensing terms with OEMs represent conduct in which only a monopolist could engage.

43.     Similarly, Google has entered into so-called Anti-Fragmentation Agreements ("AFAs") and Android Compatibility Commitments ("ACCs") with OEMs licensing the Android OS.  The Android OS is nominally "open source," meaning that the Android codebase is publicly available for others to view, use, and modify.  But the AFAs and ACCs prohibit those OEMs from creating and selling "forks" of the Android OS—*i.e.*, versions of Android derived from Android's open-source codebase but modified, developed, and distributed by third parties rather than Google— that might permit those OEMs to circumvent Google's self-preferencing requirements.  Entering into an AFA or ACC is a precondition to an OEM being able to enter into a Mobile Application Distribution Agreement ("MADA") and Revenue Sharing Agreement ("RSA"), which, as discussed *infra* in Parts II and III, are commercially indispensable to OEMs.  This, too, is something only a monopolist could force its customers to do without fear of losing market share to its competitors.

44.     This conduct also creates a further barrier to entry in the Merchant Market for Mobile OSs by restricting the ability of OEMs to support alternatives to Google's version of Android and making it more difficult for consumers to switch to other mobile OSs.

## II.    THE MARKETS FOR GENERAL SEARCH SERVICES AND SEARCH ADVERTISING

45.     Google's dominance in the Android Markets should also be considered against the backdrop of its dominance in two other markets: the market for **General Search Services** and the related market for **Search Advertising**.

46.     In the mid-2000s, the emergence of modern smartphones marked a paradigm shift in computing, as consumers increasingly accessed the Internet and digital services through mobile platforms rather than traditional desktop computers.  Recognizing that the mobile ecosystem threatened to disrupt and redirect attention away from the web-based pathways that fueled Google's then-core business, Google moved aggressively to ensure that it could control the next generation of computing.  As discussed *infra* in Parts III and IV, Google's monopolization of the Android

PLAINTIFF'S COMPLAINT

Markets was the intended result of a decades-long strategy in which Google sought to use its existing dominance in general search—and, corollary to that dominance, the enormous value of advertising to Google's general search userbase—to secure default distribution and preferencing for the Google Play Store, and by extension, Google Play Billing.

## A.    MARKET DEFINITION

47.    **General Search Services.**  A general search engine ("GSE") is a tool to search the worldwide web using queries.  GSEs attempt to answer all queries by providing search results that are relevant to those queries.  Unlike specialized or "vertical" search tools that return results from a narrow category (such as shopping, restaurants, videos, or searches limited to a single app), GSEs are designed to answer a broad range of queries by searching across a wide portion of the Internet and presenting results to users in a ranked list.

48.    As the district court found in *Google Search*, there exists a relevant market for General Search Services in the United States.  In this market, GSEs (like Google, Bing, and DuckDuckGo) compete to provide responses to general-search queries from users.  Alternative sources of query information, like "vertical" search tools and social media sites, are not reasonably interchangeable with general search services because general search services have peculiar characteristics and uses; are recognized in the industry as a distinct product for which other sources of query information are not reasonable substitutes; and require unique production facilities.

49.    **Search Advertising.**  Beyond their informational function, search engines that return information in response to user queries are invaluable advertising opportunities for goods and services sellers.  For instance, when a user searches for "Bluetooth speakers" on Google Search, the search results page contains not only links relevant to the user's query, but advertisements as well, potentially including text advertisements, product listing advertisements, or even advertisements for audio-focused mobile apps.  Unlike other forms of advertising, search advertising offers advertisers the chance to respond to real-time, expressed intent discernable from a user's query; for example, a user who looks up "Bluetooth speakers" is more likely to be interested in purchasing Bluetooth speakers than the average viewer of a non-targeted ad.

PLAINTIFF'S COMPLAINT

50.     As the district court found in *Google Search*, there exists a relevant market for Search Advertising in the United States.  In this market, search providers (including not only general search engines, but also "vertical" search providers like Amazon and social media platforms like Facebook) compete to sell advertisements to various companies and individuals looking to advertise their products and services.  Alternative sources of non-search advertising are not reasonably interchangeable with search advertising because search advertising has peculiar characteristics and uses; it is recognized in the industry as a distinct product market; users do not shift their spending away from search advertising even in the face of price hikes; it requires unique production facilities; and it employs distinct pricing models.

## B.    MONOPOLY POWER/MARKET POWER

51.     **General Search Services.**  As the district court found in *Google Search*, Google has monopoly power in the General Search Services Market.  Google captures immense revenues and profit margins from its general search product, and has admitted that it does not "consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product."  The ability to degrade product quality without concern of losing customers is something only a firm with monopoly power could do.

52.     Google also has a dominant market share protected by significant barriers to entry.  As the district court found in *Google Search*, Google enjoyed an 89.2% share of the market (measured by query volume) as of 2020, which increases to 94.9% on mobile devices.  The next-largest competitor is Bing, with a share of 5.5% on all queries and 1.3% on mobile.  Public-source metrics post-dating the *Google Search* trial have continued to place Google's share of the market at between 89% and 92% between 2020 and 2026.  Google's dominance is durable; it has enjoyed an over-80% share since at least 2009.  And it is insulated from competition by multiple, mutually-reinforcing entry barriers, including high capital costs, Google's control over general-search distribution channels, brand recognition, and scale effects.

53.     **Search Advertising.**  As the district court found in *Google Search*, although the plaintiffs in that case had not proven that Google had monopoly power in the market for Search Advertising, Google had nevertheless held a durable share of at least 65% in the market since 2012,

PLAINTIFF'S COMPLAINT

despite the market's enormous growth over the last decade. The district court likewise found that the capital cost of developing an ad platform is high, presenting a barrier to potential entrants. The district court ultimately determined that Google did not have monopoly power in the market for Search Advertising in significant part because it competed with companies like Amazon, Home Depot, Walmart, and Target in that market—companies that sold and advertised physical goods—each of which have significant shares on their own. *See Google Search*, 747 F. Supp. 3d at 133-35.

## C.    ANTICOMPETITIVE CONDUCT AND EFFECTS

54.    As the district court found in *Google Search*, Google engaged in at least two categories of unlawful exclusive agreements to maintain its monopoly in the market for General Search Services: (i) search distribution agreements with browsers, and (ii) search distribution agreements with Android OEMs.

55.    *First*, Google entered into exclusive agreements with Internet browser companies (primarily Apple and Mozilla) to establish Google as the out-of-the-box default search engine on their browsers. Under these agreements, Google Search was preloaded as the exclusive default search engine on all Safari (Apple's browser) search access points; in return, Apple received a percentage cut of Google's search profits. Google entered into similar agreements with Firefox (Mozilla's browser) and S Browser (Samsung's browser).

56.    *Second*, Google entered into two types of exclusive agreements with OEMs licensing the Android OS: Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs").

57.    MADAs are device-by-device licenses that allow OEMs to use Google's proprietary mobile applications developed for the Android ecosystem, referred to as Google Mobile Services ("GMS"). The GMS applications include the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, Google Drive, and of particular note here, the Google Play Store. OEMs pay no fee for the GMS license. Without a MADA, an OEM cannot distribute any of these applications.

58.    As a condition of the MADAs, Google requires OEMs to preload certain applications—including the Google Search widget and the Google Play Store—in prominent places within the smart mobile device interface. In practice, OEMs recognize that preloading more than

PLAINTIFF'S COMPLAINT

one of the same search access points, especially in similar prominent positions, is a suboptimal design that would degrade the user experience.

59.     RSAs are separate agreements from the MADAs, but an OEM cannot enter into an RSA without first entering into a MADA.  Each RSA generally follows a tiered structure, in which Google provides OEMs with a share of its revenue from Google Search tied to the degree of device exclusivity.  For example, Google's RSA with Samsung—one of the largest Android OEMs worldwide—provides that Samsung will receive a base percentage revenue share for devices complying with prior terms, and will receive additional incremental revenue share if Samsung provides additional preferencing to Google apps, such as setting certain search access points to Google, or as discussed *infra* in Part III, preloading *only* the Google Play Store as the default app distributor for the device.  The same is substantially true for Google's RSA with Motorola, another significant Android OEM.

60.     These agreements foreclosed a significant amount of the market to competing providers of general search services; they deprived rivals of scale; and they reduced the incentives of rivals to invest and innovate in those markets.

## III.     THE ANDROID APP DISTRIBUTION MARKET

61.     Mobile apps are software programs that allow users to access content, services, and functionality on smart mobile devices.  Much of what consumers think of as a "smartphone" is, in reality, the collection of mobile applications that run on it.  Functions such as messaging, navigation, video streaming, social media, music, mobile gaming, and shopping are delivered primarily through apps rather than the device hardware alone.  Accordingly, the ability to discover and access apps tailored to a user's unique interests is an indispensable part of that user's mobile experience.

62.     App stores are central gateways in the mobile ecosystem.  Today, they are the primary means by which users find, install, and update apps, and they shape which apps can realistically reach users at scale.  Although OEMs have the ability to pre-install apps on smart mobile devices, they cannot feasibly anticipate the needs of each individual user at the point of sale.  Users' ability to customize their devices to suit their interests—including interests developed after purchase—thus relies fundamentally on those users' ability to install mobile apps themselves *after*

PLAINTIFF'S COMPLAINT

they buy their mobile devices. With few exceptions, users do so through app stores, in which they can browse, search for, purchase, and download mobile apps. On Android, app downloads are overwhelmingly conducted through the Google Play Store.

63. The Google Play Store's dominance in distributing mobile apps on Android cannot be explained by competition on the merits alone. Through a carefully-engineered series of anticompetitive acts, Google instituted restraints on players at all levels of the app ecosystem—the OEMs who manufacture Android-compatible devices; the network operators who provide telecommunications services on those devices; the developers who create Android apps; the users who consume them; and even the app stores that compete or could potentially compete with Google—to ensure that an overwhelming share of app downloads occur within the Google Play Store. The individual and cumulative effect of Google's conduct was to substantially foreclose competition and maintain its monopoly in the Android App Distribution Market.

A.    MARKET DEFINITION

1.    Product Market

64. As the jury found in *Epic v. Google*, there exists a relevant market for Android App Distribution. This market includes all the channels by which mobile apps may be distributed to users of mobile devices running the Android OS. It primarily includes app stores like Google's Play Store, Samsung's Galaxy Store, and Aptoide. It also includes the direct downloading of apps without using an app store, *e.g.*, by navigating to an app's website on a browser and downloading the app directly from the developer's website. In practice, however, this method of direct-downloading apps (often referred to as "sideloading") accounts for a very small share of total app downloads. For that reason, OEMs find it commercially unreasonable to sell smart mobile devices without at least one app store preloaded onto the device.

65. App stores are OS-specific, meaning that each app store distributes only apps compatible on the operating system in which the app store is used. For example, the Google Play Store, the Samsung Galaxy Store, and the Aptoide Store distribute only Android-compatible apps on Android devices, and Android users could only use these and other Android app stores to access Android apps. Android users could not, for example, use Apple's App Store (which runs on a

PLAINTIFF'S COMPLAINT

different operating system), because Apple's App Store is not available on Android devices, is not compatible with the Android OS, and does not offer apps compatible with the Android OS. Thus, non-Android app stores are not included in the Android App Distribution Market.

66.    Competition at the smart mobile device level—*i.e.*, the theoretical possibility that a user could avoid the Google Play Store by simply purchasing a mobile device running Apple's iOS instead—is not a meaningful competitive restraint in the Android App Distribution Market. In addition to the significant switching costs of purchasing a new mobile device, switching from Android devices often entails a significant loss of personal and financial investment that users have already put into the Android ecosystem. Moreover, consumers are not necessarily aware of their preferences in the app distribution market at the time of purchasing a mobile device. Furthermore, competition at the smart mobile device level is materially constrained by Google's relationship with its next-largest competitor in the sale of mobile devices, Apple. Google has entered into a number of revenue-sharing agreements with Apple that result in less effective competition between them.

67.    It is true that some developers create different versions of the same app that are compatible with different OSs. For example, apps like TikTok offer both an Android version and an iOS version. However, these different versions are separate, platform-specific applications designed to run on different operating systems. Even when consumers think of an app as "the same app" across devices, an Android app store carries only an Android-compatible version, while Apple's App Store carries only an iOS-compatible version, because each operating system requires its own compatible app implementation.

### 2.    Geographic Market

68.    As the jury found in *Epic v. Google*, the geographic scope of the Android App Distribution Market is worldwide, excluding China. With the exception of China, app stores and other app distribution channels are developed, distributed, and made available on Android devices on a global basis. China is excluded from the relevant market because legal and regulatory barriers prevent operation of the Google Play Store and other global app stores within China; conversely, app stores prevalent in China have little footprint elsewhere.

PLAINTIFF'S COMPLAINT

**B.     MONOPOLY POWER**

69.     As the jury found in *Epic v. Google*, Google has monopoly power in the Android App Distribution Market.  Google's monopoly power is reflected through both indirect evidence of a dominant share protected by significant barriers to entry, as well as direct evidence of conduct only a monopolist could do.

70.     **Indirect Evidence.**  Google holds a dominant share of the market.  According to 2020 data cited in the Ninth Circuit's *Epic v. Google* decision last year, the Play Store accounted for over 80% of all Android app downloads around the world (excluding China), and over 95% of all Android app downloads in the United States.  In 2023, Google's dominant share led the European Commission to designate Google Play as a "gatekeeper" in the Android app-distribution market—reflecting its judgment that Google Play has a significant impact on the market; provides a core platform service which is an important gateway for business users to reach end users; and enjoys an entrenched and durable position in its operations.

71.     Google also holds a dominant share of the market measured by app store pre-installations.  *See United States v. Google LLC*, 747 F. Supp. 3d 1, 149 (D.D.C. 2024) (the Google Play Store is a "must-have on all Android devices"); *see also id.* at *150 (describing the "market reality that the Google Play Store is viewed by OEMs as essential to the Android customer experience"); *id.* (Microsoft CEO says that "without the Play Store, the 'phone is a brick'"); *id.* (Samsung "deems the Play Store essential").  As the European Commission found in 2018, the Google Play Store comes pre-installed by OEMs on virtually all Android mobile devices, except those sold in China.  No other Android app store is pre-installed on more than 10% of Android devices.

72.     Google's market share is likewise dominant when calculated as a function of its app catalog, *i.e.*, its successful "sales" to developers of app distribution services.  Today, the Google Play Store offers over 3 million apps, including every single one of the most popular Android apps.  Aptoide, the third-largest-competitor to Google, carries by comparison approximately 436,000 apps.

73.     Google's monopoly shares are protected by significant barriers to entry.  The Google Play Store benefits from ongoing network effects based on the large number of participating

PLAINTIFF'S COMPLAINT

20

developers and users.  These large complementary user- and developer-bases create a "flywheel" effect: the higher the number of apps, the more users want to use the Google Play Store, and the more users the Google Play Store has, the more developers want to distribute their apps on the Google Play Store.  These network effects have particular salience at the OEM level, where smart mobile device manufacturers must decide how to allocate limited real estate when choosing which app stores to preinstall on the phones they sell.  As discussed above, Android OEMs find it commercially unreasonable to sell phones without the Google Play Store, because they view other app stores as poor substitutes for the Google Play Store given their smaller catalogs.

74.    **Direct Evidence**.  Google's monopoly power is also evident in its supracompetitive pricing, which is not responsive to competitors' pricing.  As of this filing, Google still imposes a per-transaction commission price of 30% for apps distributed through the Google Play Store, which is substantially higher than prices that would exist under competitive conditions.  Aptoide, for example, charges only a 10-25% commission—17-66% less than Google's 30% rate—and its commission price also includes user-acquisition tools that developers on Google Play must pay extra for.  Nevertheless, despite the existence of lower-cost options, developers risk significant revenue loss from not being on Google Play due to the number of users captive to its app store ecosystem.

### C.    ANTICOMPETITIVE CONDUCT

75.    As the jury found in *Epic v. Google*, Google willfully acquired or maintained monopoly power in the Android App Distribution Market by engaging in anticompetitive conduct.  Google's anticompetitive conduct can be broken down into several discrete categories, which individually and collectively have allowed Google to obtain a near-absolute monopoly in Android app distribution.

### 1.    Conduct Relating to OEMs.

76.    **MADAs**.  As discussed *supra* in Part II.C, and as the district court found in *Google Search*, Google conditions OEMs' ability to license the Google Play Store on those OEMs' entering into MADAs.  As of 2019, about 2.3 billion Android devices were subject to a MADA.  Google employees were not aware of any non-MADA Android device sold in the United States.

PLAINTIFF'S COMPLAINT

77.     As relevant here, until at least 2024, the MADAs required OEMs to provide the Google Play Store with preferential treatment compared to any other competing app store in order to be able to offer users *any* pre-installed Google apps.  Specifically, the MADAs required that OEMs pre-install the Google Play Store, along with a suite of up to 30 other Google apps located on the "home screen" of each mobile device.  This requirement, which takes up valuable real estate on mobile devices that could otherwise be occupied by competing app stores, effectively ensures that the Google Play Store is the most prominent app store on any device manufactured by OEMs subject to a MADA.  Absent this requirement, OEMs would be able to enter into contracts with competing app stores to preinstall their app stores on a preferential basis, which would have enabled Aptoide to viably offer a competitive alternative to the Google Play Store.

78.     **RSAs and Other Exclusive Agreements.**  As discussed *supra* in Part II.C, and as the district court found in *Google Search*, Google also entered into RSAs with OEMs—which required prior entry into a MADA—that provided those OEMs with a share of Google's revenue from its Search business (and, in some cases, from the Play Store) in exchange for making the Google Play Store the exclusive pre-installed store on the devices they manufactured.  As the trial record for the remedies phase of *Google Search* makes clear, Google has continued to enter into RSAs as recently as 2025.

79.     Since 2019, Google has entered into a number of agreements with certain OEMs (the "Premier Device Program"), including Nokia, Motorola, LG, Oppo, Vivo, OnePlus, Xiaomi, Sony, and Sharp, prohibiting or severely penalizing the preinstallation of any competing app store other than Google Play.  Some of these agreements, for example Google's agreement with LG, even required Google's OEM counterparties to block the "sideloading" of apps directly from developers' own websites.  Google intentionally designed these agreements to snuff out potential competition from competing app stores.

80.     It is a reality of the industry that OEMs cannot give up the revenue-share from Google's Search business and remain competitively viable.  *See Google Search*, 747 F. Supp. 3d at 100.  OEMs get 8% of Search revenues under a RSA, and 4% on top of that for Play exclusivity.  Google thus uses monopoly profit-sharing from its Search monopoly to create an indispensable

PLAINTIFF'S COMPLAINT

source of revenue for OEMs in the form of RSAs, and then requires as a condition of those RSAs that OEMs preference Google Play, maintaining its monopoly in the Android App Distribution Market.

81. Absent Google's conduct, Aptoide could and would negotiate with OEMs to make the Aptoide Store available to customers via pre-installation on devices at sale. In the last decade, Aptoide has reached out to numerous OEMs and was told that the Aptoide Store could not be preloaded onto the home screen of those OEMs' devices because they were reserved for Google's apps, including the Google Play Store.

82. **AFAs and ACCs.** As discussed *supra* in Part I.C, Google also required OEMs to enter into AFAs and ACCs as a condition of licensing the Android OS. Those agreements preclude OEMs' modification of Android to offer competing app stores or frictionless direct downloading. In other words, the AFAs and ACCs preclude circumvention of the MADAs' and RSAs' strict requirements that the Google Play Store be prioritized above its competitors, often on an exclusive basis.

83. **The Compatibility Test Suite (CTS).** Beyond its deals ensuring that OEMs would not find it economically viable to preload any competing app store on a preferential basis, Google also erected an additional, technical barrier to app-store competition: its Compatibility Test Suite ("CTS"). Google describes the CTS as a "free, commercial-grade test suite and tools to help ensure that your devices are Android compatible." In reality, the CTS provides Google with unfettered discretion to block OEMs from preloading any apps they deem "incompatible" with the Android software and hardware, including competing app stores like Aptoide.

84. OEMs that wish to pre-install the Google Mobile Services (GMS) apps—including the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, Google Drive, and the Google Play Store—must certify to Google that their devices are CTS-compliant. Thus, for the reasons discussed above, CTS compliance is a commercial necessity for OEMs. In 2018, Google took this one step further: not only could GMS apps not be *preloaded* onto devices Google deemed noncompliant through the CTS, but they also no longer could be downloaded *even after sale* onto non-CTS-compliant devices.

PLAINTIFF'S COMPLAINT

23

85.     Google used the CTS as a means of deterring OEMs from preinstalling competing app stores, including Aptoide. By their nature, app stores require permissions on Android devices to install "packages"—in other words, to take apps uploaded by developers and place them onto users' devices. Over the last decade, Aptoide has reached out to numerous OEMs worldwide in an attempt to obtain preloading of the Aptoide Store on those OEMs' devices, and each time, the OEMs indicated to Aptoide that it would have to receive approval from Google by showing why the Aptoide Store needed the right to install packages. The preloading of a package-installing app on an Android device without such approval risks losing CTS compliance, and by extension, the ability to distribute *any* of the must-have apps in the GMS suite. This process creates substantial friction and a significant bargaining disadvantage for app stores other than Google Play, and has resulted in Aptoide's inability to preload the Aptoide Store on OEMs' devices on more than one occasion.

86.     Having experienced significant issues with CTS approval, Aptoide reached out to Google in November 2019 to request a workaround through which the Aptoide Store and the GMS apps could be preloaded by OEMs concurrently on Android devices. Google did not respond.

### 2.     Conduct Relating to Mobile Network Operators (MNOs).

87.     **RSAs.** MNOs are mobile network operators, *e.g.*, AT&T, T-Mobile, and Verizon. Some MNOs have considered creating their own app stores. Faced with this threat, Google entered into a number of different agreements internally acknowledged as intended to quash the risk of competition. As with the OEMs, Google offered certain MNOs lucrative revenue-share agreements that split the revenue from app purchases—often up to 25%. Google expressly intended that this would offset the MNOs' opportunity cost of giving up their own app distribution channels. Google has signed RSAs with each of the three major wireless carriers, and all three major carriers have enrolled all Android devices sold at the highest revenue tier, *i.e.*, requiring the highest degree of exclusivity for Google apps, including the Play Store. According to the trial record for the *Google Search* remedies phase, Google entered into extensions of its RSAs with MNOs at least as recently as 2025.

PLAINTIFF'S COMPLAINT

**3.    Conduct Relating to App Developers.**

88.    Google also imposes a number of anticompetitive restraints directly on app developers that substantially foreclose competition from competing app stores.

89.    **Developer Distribution Agreement (DDAs).**    Each app developer—including developers of competing app stores, which are themselves apps—must sign a Developer Distribution Agreement (DDA) with Google as a precondition to distributing their apps through the Google Play Store.  Each of the Defendants, except Google Payment, is a party to the DDA.

90.    Although this Court's injunction following the *Epic v. Google* trial required Google to rescind its longstanding policy of preventing the distribution of any competing app store from being listed on Google Play (as discussed below), Aptoide has not been able to successfully list either the Aptoide Store or the Aptoide Wallet on Google Play, despite submitting both to Google for inclusion.  As to the Aptoide Store, Google has claimed that the app was not "compliant with Google Play Developer Program Policies."  Aptoide Wallet, on the other hand, was accepted by Google Play but appeared to be shadow-blacklisted in the store, *i.e.*, it did not show up at all when users searched for the keyword "Aptoide" in the Google Play app.  When Aptoide reached out to remedy the issue, it received a generic response that the app did not "meet [Google's] high-quality apps and games criteria," even though the issue was related to the app's visibility in the store, not whether it could be accepted for distribution.  As of the date of this filing, Google has not resolved these issues.

91.    Aptoide is and has been significantly affected by the DDA's terms.  The DDAs require, *inter alia*, that no competing app store may be distributed through the Google Play Store, without any technological or other justification.  Section 4.5 of the DDA—including Google's currently-published version effective as of September 2025—provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  The DDAs are non-negotiable contracts of adhesion, and Google reserves the right under the DDA to remove and disable any Android app that it deems to have violated its no-competing-store requirement.

PLAINTIFF'S COMPLAINT

25

92.     In other words, for mobile devices on which Google Play is the only preinstalled app store, users seeking to access an alternative app distribution channel must download a competing app store directly from that app store's website.  For the reasons discussed *infra* in Part III.C.5, the experience of direct-downloading, or "sideloading," a competing app store effectively precludes any rival app store from achieving scale.

93.     In the absence of these restraints, competing app stores like Aptoide could allow users to replace or supplement the Google Play Store on their devices by listing their app stores through the Google Play Store—the only option to meaningfully reach a significant group of mobile users.  Competition among app stores benefits users by giving them the option to discover and purchase apps through distribution channels other than Google Play, lowering prices and increasing consumer choice.  Aptoide has been damaged by Google's conduct because it was substantially foreclosed from competing with Google and lost the opportunity to reach Android users it would have reached in a competitive market.

94.     **The "App Campaigns" Program.**  Google further reinforces Google Play Store's dominance through its App Campaigns advertising program.  That program is marketed by Google as an opportunity for app developers to reach more users by providing streamlined access to valuable Google-owned advertising channels.  Of particular relevance here, developers that take part in the App Campaigns program are able to advertise their apps through the Google Search results page, where users searching for certain keywords can download relevant apps on their results pages with a single tap ("one-tap" downloads).

95.     Google has always required (including today) that Android app developers who wish to take part in the App Campaigns advertising program list their app in the Google Play Store. For apps not listed in Google Play, users searching for a relevant keyword would not receive a one-tap link to download the mobile app; instead, they would simply be given a link to the developer's website, where a user could initiate the onerous, often prohibitive process of downloading an application directly from the Internet.  This is not a mere inconvenience; as discussed *infra* in Paragraphs 112-130, the multi-step sideloading process is fraught with multiple technical barriers

PLAINTIFF'S COMPLAINT

and scare screens that have had the actual effect of preventing a significant number of intended downloads altogether.

96.     For instance, in the first example below, a Google Search user interested in puzzle games may search for the phrase "game puzzle" in Google Search.  The first results that the user would see are the Jigsawscapes and Zen Word apps, which are listed in Google Play, alongside "Install" buttons through which the user could immediately download those games.  If those apps instead chose to list their apps in Aptoide, they would not only be buried in the search results under competing apps listed in Google Play; they also would not be able to offer users the opportunity to download their apps in one tap from the Google Search results page at all.  The contrasting example below demonstrates that a user searching up the "Strike!" app—which is distributed by Aptoide but not Google Play—would see only a link to the publisher's website, without any apparent way to actually download the app.

 

97.     Thus, although App Campaigns is advertised as a means of helping developers expand their user base, it operates more as a threat: developers *must* list their apps in the Google Play Store or be cut off from key advertising channels used by their competitors.  The program is structured so that developers seeking access to Google's search-driven reach are pushed toward the

PLAINTIFF'S COMPLAINT

Play Store, while alternative Android app distributors lack comparable access to similar advertising infrastructure.

98.     Being barred from one-tap downloads on Google Search is a severe punishment for developers.  For most mobile-device users unboxing their Android device for the first time, app discovery follows a predictable path.  Users turn first to whatever app store comes pre-installed on their device; for the reasons discussed above, this is almost universally the Google Play Store.  If the Google Play Store does not carry the app, or if users wish to obtain the app on different distribution terms, their next option is to search for the app through a general search engine.  Again, for the reasons discussed above, Google Search is the default access point for the overwhelming majority of Android users.

99.     If one-tap download functionality is unavailable on users' search results, they are left with no practical alternative but to navigate a multi-step sideloading process that is technically burdensome, unfamiliar to the average user, and designed in a way that forecloses downloading at scale.  As discussed in Paragraphs 112-130, *infra*, this process was successfully engineered to increase user friction for accessing apps anywhere outside of Google Play.  Thus, even developers who have successfully advertised their apps to interested users will see a significant portion of those users funneled back into the Google Play ecosystem—not by choice, but by the practical impossibility of the only available alternative.

100.     By Aptoide's internal metrics, the inability to offer users one-click downloads from the Google Search results page correlates with an approximate decrease of between 70-90% downloads per comparable application, depending on the intent of the user.  For users already interested in a specific app not listed in Google Play, their inability to download that app in one tap—and Google's requirement that they navigate multiple scare screens and technical barriers before installing that app—is a significant deterrent.  For users merely using Google Search to browse apps, that effect is magnified several times over.  Users who have not yet decided on a particular app are substantially more likely to choose one they can access easily; non-Play apps are buried under their Play-listed competitors, making their discovery more difficult; and users face the same download barriers applicable only to non-Play apps.

PLAINTIFF'S COMPLAINT

101.    As discussed above in Part II, Google has a monopoly in the General Search Services Market, and significant market power in the Search Advertising Market.  As the Court found in *Google Search*—and as public-source data on Google's search monopoly has shown from that time into the present day—between 89%-92% of searches on general search engines are routed through Google Search.  Developers consider one-click advertising on the Google Search results page to be a critical means of obtaining new users, meaning that to refuse to list their apps in the Google Play Store would mean foregoing the valuable growth opportunity from being able to place such advertising.  Google's coercive gating of its search users behind use of the Play Store hobbles developers' ability to decide what app store fits their needs best, and ensures dominance of the Play Store for reasons unrelated to competition on the merits.

102.    **Project Hug, the Games Velocity Program, and the Apps Velocity Program.**  In 2019, following its dispute with Epic regarding the potential launch of Fortnite through other stores rather than the Google Play Store, Google launched an initiative called "Project Hug," now referred to as the "Games Velocity Program."  Under this program, Google spent hundreds of millions of dollars to enter into agreements with at least 24 of the top game developers in the Android ecosystem, in which Google paid them significant sums of money in exchange for their agreement not to open a competing store or otherwise distribute their apps outside of the Google Play Store. Google viewed the potential for app developers to "go on their own" without launching on the Google Play Store as a "contagion" that would endanger Google Play's dominance. Google specifically identified developers who were "most at  risk . . . of attrition from Play" and systematically approached each of them with an offer designed to prevent horizontal competition on the merits.

103.    These agreements impose, among other things, obligations on the developers to release mobile titles on the Google Play Store at the same time or earlier than they do on other app stores; not to remove their titles from the Google Play Store; and to maintain content, feature, and advertising parity between titles released on the Google Play Store compared to those released on other app stores.

PLAINTIFF'S COMPLAINT

104.    For example, according to an internal Google email, Activision Blizzard, Inc. ("ABK"), one of the largest game developers in the world, told Google that it was considering starting its own competing Android app store, but that the decision depended on whether it "can find the right deal/solution with [Google]."  Google subsequently entered into a three-year agreement with ABK, which was signed on January 24, 2020, pursuant to which Google agreed to pay ABK approximately $360 million.  In exchange, ABK agreed to restrictions of the sort discussed above— for example, to launch all ABK games on the Google Play Store before or on the same date it launched them on any other store and to maintain feature and content parity in the games it released on the Google Play Store compared to any other store.

105.    Google understood and intended that its agreement with ABK effectively ensured that ABK would abandon its plans to launch a competing app store.  Specifically, Google understood that ABK's narrow path to launching a viable competing Android app store depended on ABK's ability to offer on its store compelling ABK apps on an exclusive or early-access basis, or with additional features or content not available from other stores.  Given the inherent advantages of the Google Play Store from its pre-installation on all Android phones, its preferential placement on all Android phones, Google's exclusivity agreements with nearly all OEMs and the myriad technical restrictions that Google imposes on alternative Android app stores, it was important for ABK to be able to offer unique apps and other content to attract Android users. The agreement that Google proposed to, and reached with, ABK prevented such differentiation.  Google thus paid ABK hundreds of millions of dollars not to compete.  ABK has not entered the Android App Distribution Market to date.

106.    As another example, Riot Games, Inc. ("Riot"), another top game developer that was contemplating launching a competing app store, entered into a one-year Project Hug agreement with Google on March 9, 2020, under which Google paid Riot approximately $30 million and Riot agreed not to launch early or exclusive titles on other app stores and to maintain content, feature, functionality, and promotion parity between its titles on the Google Play Store and on other app stores.  Google understood and intended that Riot, like ABK, would not launch a competing Android app store absent the ability to offer exclusive Riot apps in that store—an ability Riot gave up in

PLAINTIFF'S COMPLAINT

exchange for millions of dollars. Riot also has not entered the Android App Distribution Market to date.

107. Google entered into other agreements and understandings with potential competing app distributors, including, for example, Supercell, to minimize their ability to operate competing app stores. During her deposition in *Epic v. Google*, Google's Vice President of Apps and Games, testified that Google had recently entered into yet another agreement with Supercell, one of the largest game developers on Android.

108. At least some of these agreements were horizontal agreements among potential app store competitors, and these agreements had the actual and intended effect of inducing those developers from not launching a competing app store that would compete with Google in the Android App Distribution Market.

### 4. Conduct Relating to Competing App Stores.

109. **Neutralizing Competitive Threats by Agreement.** In addition to the DDAs, which prevent the distribution of competing app stores on Google Play, Google also internally explored options to neutralize its competitive threats by negotiating with them directly. Documents discussing Google's "Project Banyan" show that in 2019, Google executives traveled to Korea to discuss an "app distribution proposal" in which Google would pay Samsung "up to $60M" in return for Samsung's agreement to allow Google Play to host all of the apps in Samsung's Galaxy Store and process all of the payments within apps distributed through Samsung's Galaxy Store. In other words, under this proposal, the Galaxy Store would be reduced to a storefront for the Google Play Store, while the Galaxy Store's entire app catalog—including the processing for in-app payments occurring in apps downloaded therein—would effectively be run by Google behind the scenes.

110. Google ultimately chose not to pursue Project Banyan, despite it being authorized by Google's Business Council. The strategy of reaching a partnership with Samsung to neutralize it as a competitive threat in the app distribution market, however, has long been discussed as a strategic objective within Google's internal documents. In 2011, senior Google executives were "having discussions with Samsung to get them to stop distributing apps through Samsung App store"; in 2013, Google again met with Samsung to discuss the possibility that "Samsung Apps

PLAINTIFF'S COMPLAINT

should no longer compete directly with Google Play"; and in the Complaint filed by 36 States and the District of Columbia in *State of Utah, et al. v. Google LLC, et al.*, the plaintiffs alleged that Google after Project Banyan sought a different implementation toward the same anticompetitive goal of eliminating or limiting the competitive threat posed by Samsung.

### 5. Conduct Relating to App Users.

111. Google also engages in a range of conduct directed at users, ensuring that the consumer experience of downloading apps and app stores outside of Google Play is confusing and difficult, particularly for non-tech-savvy users of Android devices. The individual and collective impact of these actions has been to insulate Google Play from competition on the merits.

112. **Sideloading.** Google directly interferes with users' interaction with mobile apps outside the Google Play Store by impeding direct downloads of mobile apps from developers' websites, a practice Google refers to as "sideloading." Under the pretext of user security, Google creates substantial friction for users seeking to sideload apps, including numerous scare screens, requiring users to engage in a highly technical and onerous process of changing specific settings within their mobile devices, and refusing to allow direct-downloaded apps to update in the background.

113. As discussed above, sideloading is the only way that the vast majority of users with smart mobile devices running the Android OS can get access to the Aptoide Store itself (because the vast majority of OEMs' smartphones come with the Play Store pre-installed and prioritized, *see* ¶¶ 76-81, and because Aptoide's app store cannot be downloaded on the Play Store, *see* ¶¶ 89-93). But even putting aside the competitive disadvantage to which Aptoide is subject by having to be sideloaded, Google has affirmatively erected additional barriers to such sideloading by making it extraordinarily difficult for users to do so as a technical matter. The below images captured in July 2025—well after the *Epic v. Google* verdict and affirmance in the Ninth Circuit—demonstrate the steps a user still must take in order to successfully download Aptoide's app store:

PLAINTIFF'S COMPLAINT

114.    First, the user must itself navigate to Aptoide's website through a browser.



115.    Even navigating to Aptoide's website has involved substantial interference by Google.  For a period of time in 2025, Google blocked Aptoide's website in Chrome, preventing users from visiting the site to download the Aptoide Store.  Users accessing Aptoide's website were presented with a bright-red scare screen indicating that Chrome had "found malware on the site you tried visiting," and informing them that "[e]ven sites that are normally safe are sometimes compromised by attackers."  The only options presented to users were to go "Back to safety" or to "Hide details," though users could click on the text of the warning to access a link described as "this unsafe site."  There was no malware on Aptoide's website, nor had that website been compromised—nevertheless, Aptoide suffered significantly reduced traffic during the period of time in which Google had erroneously classified its site as dangerous.

PLAINTIFF'S COMPLAINT



116.    Second, the user must click the "download button," noting instructions on how to navigate to their mobile device's settings to grant their device permission to install "unknown apps."



117.    Third, the user must click through a scare screen, noting that the Aptoide Store "might be harmful," and select the second, "Download anyway" button.



118.    Fourth, the user must select the correct means by which the Aptoide Store is installed—the Android "Package Installer," as opposed to the Android "Hash Checker" or "Apk Analyzer"—from a range of options not typically accessed by users.



PLAINTIFF'S COMPLAINT

119.    Fifth, the user will receive another popup from Chrome noting that "[f]or your security, your phone isn't allowed to install unknown apps from this source," and telling the user that it can nevertheless change this default in its mobile device settings.



120.    Sixth, the user will have to navigate to its mobile device settings and individually permit its device to download the Aptoide Store, giving it the ability to access specific components necessary for the Aptoide Store's installation.



PLAINTIFF'S COMPLAINT

121.    With the exception of Aptoide's website being blocked in Chrome, these user-facing hurdles continue to exist in the same or similar form today.  All of this is intended to ensure that the sideloading process for obtaining access to the Aptoide Store is complex, confusing, and threatening, leading many users to abandon the process.  Google employees have acknowledged internally that sideloading is a "[p]oor user experience."

122.    The Aptoide Store is not unique in this respect.  The process for sideloading other apps from the Internet is made similarly onerous by multiple scare screens and requirements that users manually change their settings.





123.    And, if that were not enough, Google further restricts direct downloading under the pretext of user security.  When Google deems an app "harmful," Google may prevent the installation of, prompt a consumer to uninstall, or even forcibly remove the app from a customer's device. Google's invocation of security is thin pretext for its prevention of app developers, including

PLAINTIFF'S COMPLAINT

developers of competing app stores, from reaching Android users—*Aptoide*, for example, was flagged by Google as "harmful."

124.    Google also offers Android users a program called the Advanced Protection Program ("APP"), marketed as a means for users to "defend against targeted online attacks." Consumers who have enrolled in APP are unable to directly download apps at all; their Android devices can only download apps distributed in the Google Play Store, or more infrequently, other pre-installed app stores that Google has pre-approved.

125.    **Downloads from Competing App Stores.**  The substantial download friction for apps outside of Google's Play Store is not limited to sideloading.  Even if a user were able to successfully download Aptoide's native app store, Google also imposes *additional* hurdles to downloading apps from Aptoide Store not present for downloads from Google Play.  Users who wish to download, for example, a game from Aptoide Store also face scare screens that require users to manually change their settings because, "[f]or [their] security," their phones are not able to "install unknown apps from this source."



126.    **Post-Download Interference.**  Google has also engaged in conduct to degrade the user experience for apps downloaded outside of Google Play.  One such example is disabling the ability for apps downloaded outside of Google Play to be updated automatically in the background. If the Aptoide Store—or any other app downloaded outside of Google Play—were to be updated,

PLAINTIFF'S COMPLAINT

Google denies automatic update permissions for those apps by default, often requiring users to *again* go through the process of updating their apps manually.

127.    Google does, however, permit automatic updating of apps downloaded through Google Play.  Because automatic updating is enabled for Play-downloaded apps but not apps downloaded from other sources, Aptoide is aware of an issue where apps downloaded through the Aptoide Store may be automatically updated into a *Google Play* version of the app without the user's knowledge or explicit consent.  This has significant commercial implications: as discussed below in Part IV, the Google Play version of the app requires the use of Google Play Billing rather than Aptoide's own billing software.  In other words, Google is effectively able to convert Aptoide customers into Google customers without any input from the end user.

128.    In addition, there have been numerous instances in which Aptoide's end users received automatic notifications on their Android devices informing them that the Aptoide Store contained viruses and may harm their devices.  These notifications were issued by "Google Play Protect."  After receiving such notifications—and even in cases in which the user ignored the notifications (without taking any action to uninstall on the device)—the Aptoide Store was automatically disabled, disappearing from users' devices completely.  In other cases, the Aptoide Store remained on the device, but users were unable to download any apps from the Aptoide Store, rendering it useless until the issue was resolved.



PLAINTIFF'S COMPLAINT

129.    But for Google's user-facing interference, Aptoide and other app developers could directly distribute their stores and apps to consumers who would be open to discovering and downloading apps outside of the Google Play Store.  But, as explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing the possibility of app distribution outside of the Google Play Store.

130.    There is no legitimate procompetitive justification for Google's conduct.  Indeed, users of desktop computers have for decades installed software acquired from various sources without having to navigate around scare tactics like Google's.  The operating systems used by personal computers are designed to facilitate these downloads, and security screenings are conducted by neutral third-party software operating in the background, allowing users to download software from any source they choose.  Moreover, many of the apps that are flagged as harmful and dangerous are the very same apps offered for frictionless download on Google Play, and for those apps offered simultaneously on Google Play and competing distribution channels like Aptoide, Google has access to public APIs that can easily confirm that those non-Play apps are identical in terms of trust and safety.

## D.    ANTICOMPETITIVE EFFECTS

131.    This course of conduct, individually and collectively, has substantially foreclosed competition in the Android App Distribution Market, affecting a substantial volume of commerce in that market and harming OEMs, competing app stores, app developers, and consumers.

132.    OEMs are harmed because they cannot compete with each other by offering innovative or higher-quality app stores, including those that might be tailored to specific users' needs (*e.g.*, app stores focused on providing specialized offerings and services around gaming or social media).  They are also precluded from competing with each other on the apps that they pre-install, given that their ability to create tailored combinations of pre-installed apps is severely limited by Google's requirements that they preference Google's own suite of mobile apps.

133.    Competing app stores like Aptoide are harmed because they are substantially foreclosed at the outset from meaningfully competing against Google's dominant product.  At every step of the process, competing app stores face structural barriers erected by Google: OEMs must

PLAINTIFF'S COMPLAINT

preference the Google Play Store under the MADAs/RSAs; developers cannot list their app stores in the Google Play Store; and users seeking alternatives to the Google Play Store must engage in the highly technical process of sideloading a competitor store (to the extent they even have the option to do so). Those competitors would otherwise have the ability and incentive to innovate new models of app distribution and provide OEMs, app developers, and consumers meaningful choice beyond the Google Play Store.

134. App developers are harmed because they are not able to compete with one another on their distribution models, including direct downloads, sales through curated app stores, or sales through their own app stores. In addition, the fact that many developers have no other reasonable option than to list their apps on the Google Play Store means not only that they must pay Google its current supracompetitive 30% commission, but also that Google is able to collect data on their apps' usage, allowing Google to create its own competing apps not subject to its supracompetitive 30% commission.

135. Consumers are harmed to the extent Google's 30% commission on developers is passed down to users in the form of higher prices. In addition, consumers face lower-quality app distribution channels than would otherwise exist in a competitive market.

## IV. THE ANDROID IN-APP BILLING MARKET

136. Within the mobile app ecosystem, in-app billing is the mechanism that allows users to purchase digital goods and services *within* an app, such as in-game currencies, premium features, subscriptions, or other content, without having to leave the app to complete a separate transaction elsewhere. For developers, in-app payments are the primary means of monetizing many of the most popular and profitable Android apps, many of which are free to download. For consumers, in-app billing provides an efficient and contemporaneous payment solution, linking the moment where a user decides to spend money to the point of sale.

137. Google's in-app payment processing solution is called Google Play Billing. After cementing the Google Play Store as the dominant channel through which Android users discover and obtain apps, Google moved into the adjacent market for in-app billing by imposing Google Play Billing as a mandatory payment processor for all in-app transactions conducted on apps distributed

PLAINTIFF'S COMPLAINT

by Google Play.  Through coercive contractual mandates backed by punitive enforcement, Google blocked app developers from using competing payment solutions—many of which, like Aptoide's, already exist and would have presented competitive alternatives to Google Play Billing but for Google's anticompetitive conduct.  The result of this regime is a second, mutually-reinforcing layer of monopoly control over the app ecosystem that allows Google to extract supracompetitive fees from one of the primary channels of in-app commerce.

### A.   MARKET DEFINITION

#### 1.   Product Market

138.   As the jury found in *Epic v. Google*, there exists a relevant market for Android In-App Billing.  This market includes payment processing solutions for the purchase of digital content that is consumed within Android apps—*e.g.*, purchasing in-game currency to unlock upgrades or premium content within a game.  In this market, the sellers are in-app payment-processing services like Google Play Billing, and the buyers are both Android app developers looking to integrate an in-app payment-processing solution for digital goods and services consumed within their apps, as well as Android app users who make such transactions.  This market also includes existing payment processing solutions that Android developers could have integrated into their Android apps to process the purchase of in-app digital content—*e.g.*, Visa, MasterCard, American Express, and more—but for the competitive restraints described herein.

139.   The Android In-App Billing Market does not include billing solutions for the purchase of *physical products and services* within apps.  For example, an Uber Eats user who uses the app to order a pizza for real-world consumption would not fit within the market, nor would an Uber user who uses the app to order car service.  Google uses a separate tool, Google Pay, to facilitate the purchase of physical products and services outside of the relevant market for Android In-App Billing.

140.   In-app billing services are not reasonably interchangeable with other forms of payment processing, such as those that require a user to leave the app to process a transaction.  Seamless in-app transactions enhance users' experience of the app itself; for example, the purchase of "boosts" and "extra lives" while a user is engaged in a game is different from such purchases

PLAINTIFF'S COMPLAINT

outside the app because the user may simply stop playing the game. App developers have recognized that disrupting or delaying a user's engagement with the app to require payment outside of the app is harmful to their business model; as such, out-of-app payment processing solutions are not reasonably interchangeable.

### 2.    Geographic Market

141.    The geographic scope of the in-app payment processing market is worldwide, excluding China. Outside of China, in-app payment processing solutions are marketed and sold on a global basis; within China, legal and regulatory barriers bar players like Google from operation. Conversely, the largest in-app payment processing solutions in China are not available outside of China.

### B.    MONOPOLY POWER

142.    As the jury found in *Epic v. Google*, Google has monopoly power in the Android In-App Billing Market. Google's monopoly power can be established through both indirect evidence of a dominant share protected by significant barriers to entry, as well as direct evidence of conduct only a monopolist could do.

143.    **Indirect Evidence.** As discussed *supra* in Part III.B, according to 2020 data cited in the Ninth Circuit's *Epic v. Google* decision last year, the Play Store accounted for over 80% of all Android app downloads around the world (excluding China), and over 95% of all Android app downloads in the United States. Because Google requires that the apps distributed within the Google Play Store use only Google Play Billing, Google likewise holds a monopoly share of in-app billing transactions in the Android In-App Billing Market.

144.    Google's monopoly share in the market is protected by significant barriers to entry. Google has structured the market so that no rival can realistically achieve the scale necessary to compete. In-app billing is a market characterized by network effects: billing providers must make substantial investments in integration, user trust, fraud prevention, and customer support that require significant volume to justify. But Google forecloses that volume by conditioning access to the dominant Android app distribution channel—the Google Play Store—on the use of Google Play Billing, restricting developers' ability to route users to alternative payment solutions. As a result,

PLAINTIFF'S COMPLAINT

43

even a technically capable competitor cannot attract enough transactions to compete.  Even for in-app billing services that already have the infrastructure to provide a competitive product, Google's restraints on the Google Play Store foreclose a substantial portion of apps on the market from being able to even consider alternative billing solutions.

145.    **Direct Evidence.**  There also exists direct evidence of Google's monopoly power in the Android In-App Billing Market.  For the vast majority of transactions, Google charges a 30% commission for Google Play Billing (a rate Google eventually pledged to decrease following the *Epic v. Google* litigation but which it continues to charge as of the date of this filing).  Other electronic payment processing solutions charge only a fraction of the price.  For example, Aptoide charges 16-66% less than Google's price for transactions processed using its in-app payment processing solution.  Google's ability to charge supracompetitive prices without concern for its competitors' responses constitutes conduct that only a monopolist could engage in.

### C.    ANTICOMPETITIVE CONDUCT

146.    As the jury found in *Epic v. Google*, Google willfully acquired or maintained monopoly power in the Android In-App Billing Market by engaging in anticompetitive conduct.

147.    Google imposes its DDA on all developers that list their games in the Google Play Store.  Sections 3.2 and 4.1 of Google's currently-published version of the DDA (amended in September 2025) continue to require that Android app developers enter into a separate agreement with Google's payment processor (Google Play Billing) in order to receive payment for apps and in-app digital content.  Under the DDA, app developers are not permitted to allow users even the *option* of going through an alternative payment processor.

148.    This is coercive: Google has used the DDA to block apps from Google Play that did not conform to the requirement that only Google Play Billing be used, despite a clear preference by those app developers for an alternative billing solution.  Apps like Epic Games's *Fortnite* that attempted to offer alternative payment options described their deviation from the terms of the DDA as a "$1B bet if it gets us delisted on app store."

149.    For a limited time in 2022, Google introduced a "pilot program" through which, for the first time, certain apps downloaded through Google Play could offer alternative billing providers

PLAINTIFF'S COMPLAINT

for in-app billing services. Alternative billing providers were required under this program to obtain Google's approval to participate. Aptoide, which processes in-app billing for apps distributed through the Aptoide Store, applied to compete for those transactions. It soon became clear, however, that the true function of this pilot program was little more than an attempt to quell the rising tide of concern regarding Google's monopolization of the market. Rather than legitimately opening up these apps to competition, Google charged a "service fee" for alternative billing providers so significant as to render it economically infeasible for users to choose anything other than Google Play Billing, even given the nominal option to select otherwise. The pilot program did not ultimately expand beyond the few apps initially designated as open to alternative billing providers. At the *Epic* trial, Google's Vice President of Google Play Partnerships confirmed that no games were ever eligible for this program up to the date of her testimony in November 2023, except in Korea.

150. These restrictions in the DDA result in the foreclosure of a not-insignificant amount of commerce in the Android In-App Billing Market. But for Google's illegal conduct, app developers would be able to integrate multiple in-app billing solutions into their apps, allowing both developers and users greater choice and price competition.

151. Aptoide, for example, offers its own payment-processing solution at a lower price than Google Play Billing, but is unable to compete with Google Play Billing for the overwhelming number of apps listed in the Google Play Store catalog. As demonstrated by its application to Google's 2022 pilot program, Aptoide has the infrastructure, ability, and incentive to compete for transactions outside of those distributed by the Aptoide Store, including Google Play-distributed apps. Aptoide has thus been harmed by being substantially foreclosed from the market.

152. Google has unlawfully tied its monopoly product in the Android App Distribution Market—the Google Play Store—to its own offering in the separate and distinct Android In-App Billing Market. Google has no legitimate justifications for its tie. Although it has pointed in public statements to security concerns, those justifications are pretextual; Google permits in limited instances other payment processors for apps distributed in Google Play (such as for transactions for physical goods or digital content consumed outside an app), with no impact on the security of its users' payment information. Google's 2022 pilot program, which failed not because of security

PLAINTIFF'S COMPLAINT

concerns but because of its extractive fee, likewise demonstrates that its security concerns are pretextual.

### D.    ANTICOMPETITIVE EFFECTS

153.    Google's course of conduct has substantially foreclosed competition in the Android In-App Billing Market, resulting in injuries to competing in-app payment processors, other app developers, and consumers.

154.    Google's conduct harms existing and nascent in-app payment processors.  As a direct result of the DDAs, actual and potential competitors do not have the ability to even *offer* a better product (in terms of both price and quality) for over 90% of the market.  Aptoide, for example, charges 16% less than Google when an application is downloaded from Aptoide's app store.  Nevertheless, the DDA's terms prevent the vast majority of developers from integrating Aptoide's payment solution.

155.    Google's conduct also harms app developers by effectively requiring those developers to use its in-app payment processing solution and pay a supracompetitive 30% rate on virtually all in-app payments.  This means that developers listed on Google Play must forego alternative payment processors that may offer lower fees, better fraud tools, superior user experience, or more flexible subscription management.  Those alternative payment processors could reduce costs and improve conversion.  Google's restrictions also weaken developers' direct relationships with their customers by limiting the flexibility developers can offer, making it harder for them to compete among themselves on quality.

156.    Google's conduct further harms consumers.  To the extent consumers face a direct pass-through increase in the prices for in-app content, those consumers face a financial harm.  In addition, consumers suffer from a less robust marketplace for apps as a result of developers' lessened incentives to innovate—meaning fewer options that may be cheaper or more tailored to their preferences.

PLAINTIFF'S COMPLAINT

## V.    RELATED LAWSUITS BY THE UNITED STATES, STATE ATTORNEYS GENERAL, AND PRIVATE PARTIES

157.    Google's mutually-reinforcing monopolies in the above-described markets, discussed *supra* in Parts III and IV, have been the subject of multiple successful antitrust cases covering the same claims at issue in this lawsuit.

158.    In June 2019, public reporting revealed that the Department of Justice was investigating Google's conduct in search and related markets.  Press reports indicated that the scope of the DOJ's investigation—which ultimately resulted in the *Google Search* litigation—included Google's requirements in its MADAs that smartphone manufacturers preinstall Google apps and set Google as the default search engine, as well as Google's RSAs with phone manufacturers and wireless carriers.  The DOJ released a statement the following month indicating that it had collected "convincing evidence" that Google used its monopoly power and profits to lock up key pathways in the market, including on mobile phones.

159.    In August 2020—after the news of the DOJ investigation broke but before the DOJ filed suit—Epic Games brought suit against Google.  Epic alleged violations under Sections 1 and 2 of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law ("UCL").  Epic's lawsuit focused specifically on Google's monopolization of, and anticompetitive conduct in, the markets for Android App Distribution and Android In-App Billing, but its claims relied extensively on the very same MADAs and RSAs the DOJ was then in the process of investigating.  Between 2020 and 2023, additional claimants, including developers, consumers, and state attorneys general, sued Google for similar antitrust violations.  All of these related claims were consolidated into a single multidistrict litigation in the Northern District of California.  *See generally In re Google Play Store Antitrust Litigation* (N.D. Cal. No. 3:21-md-2981-JD).

160.    Meanwhile, in October 2020, just a few months after Epic brought suit against Google, the U.S. Department of Justice and 11 States brought suit in *Google Search*.  The *Google Search* lawsuit challenged Google's monopolization of the General Search Services Market as well as certain advertising markets, including the Search Advertising Market.  *See generally United States v. Google LLC* (D.D.C. No. 20-cv-3010).  As in the *Epic* case, the DOJ's lawsuit in *Google*

PLAINTIFF'S COMPLAINT

*Search* relied heavily on Google's use of MADAs and RSAs to coerce and secure compliance by OEMs to preinstall and preference Google's suite of mobile apps, including both the Google Play Store and the Google Search widget.

161.    The *Epic* case proceeded to trial in November 2023.  Although numerous related claims had been consolidated into a single MDL (including *Epic*), every plaintiff other than Epic had settled their case in the seven months leading up to trial, leaving for trial only Epic's antitrust claims for equitable relief (as well as Google's counterclaims for breach of contract).  On December 11, 2023, after a 15-day trial spanning forty-five witnesses and more than three hundred documents admitted into evidence, the jury returned a unanimous verdict in favor of Epic.

162.    As relevant here, the jury found that Epic had proven the relevant product markets of Android App Distribution and Android In-App Billing Services and a relevant geographic market as to each of "worldwide excluding China."  The jury likewise found that Google violated both the Sherman Act and the Cartwright Act by willfully acquiring or maintaining its monopoly in those two markets, unreasonably restraining trade, and unlawfully tying use of the Google Play Store to Google Play Billing.

163.    Google appealed both the liability verdict and the resulting injunction entered by the district court.  On July 31, 2025, a unanimous Ninth Circuit panel affirmed the jury's verdict, as well as the district court's injunctive remedies, in full.  On October 27, 2025, Google filed a petition for writ of certiorari in the Supreme Court.  Epic and Google later reached a comprehensive settlement contingent on this Court entering a modified injunction on the terms proposed by the parties.  The propriety of that settlement remains pending before this Court.

164.    On the other hand, the *Google Search* case proceeded to trial in September 2023.  There, following a bench trial spanning over two months, Judge Mehta (D.D.C.) issued extensive findings of fact and conclusions of law, finding first that the plaintiffs had successfully proven the existence of the General Search Services and Search Ads Markets.  Judge Mehta then found that Google had monopoly power in the General Search Services Market, which it unlawfully maintained in violation of Section 2 through exclusionary conduct with widespread anticompetitive effects.  In so doing, Judge Mehta found that Google's MADAs and RSAs with OEMs functioned as exclusive

PLAINTIFF'S COMPLAINT

agreements that allowed Google to compel pre-installation and preference of its own suite of apps (including the Google Play Store) over its competitors' apps.

165. Judge Mehta did not find that Google had monopoly power in the Search Ads Market, but determined that Google had maintained a durable share of over 65% in the market since 2012.

166. On January 16, 2026, Google filed a notice of appeal of the *Google Search* decision. On February 3, 2026, the United States filed a notice of cross-appeal, focusing on the remedies ordered by the district court.

167. Section 5(i) of the Clayton Act tolls the statute of limitations during the pendency of any federal government antitrust action and for one year thereafter for every "private or State right of action arising under" the antitrust laws that is "based in whole or part on any matter complained of in said proceeding."

168. This case against Google arises under the antitrust laws and is based, in part, on the matters complained of in *Google Search*. As a result, the statute of limitations has been tolled since October 20, 2020.

169. This case does not fall within the scope of the previous settlements from other cases in the Play Store MDL. The action brought on behalf of the app developer class (*In re Google Play Developer Antitrust Litigation*, N.D. Cal. No. 3:20-cv-5792-JD) settled on October 3, 2023, and bound only US developers who had signed a DDA with Google; sold an app on Google Play; paid Google a service greater than 15% on at least one such transaction; and earned proceeds between $0-$2,000,000 in every calendar year between 2016 and 2021. The action brought on behalf of the state attorneys general (*State of Utah et al. v. Google LLC et al.*, N.D. Cal. No. 3:21-cv-5227-JD) and the consumer class (*In re Google Play Consumer Antitrust Litigation*, N.D. Cal. No. 3:20-cv-5761-JD) settled on October 11, 2023, and bound only consumers who had purchased an app from Google Play or made an in-app purchase through Google Play Billing during the relevant period. The action brought by Match Group, an individual developer plaintiff (*Match Group, LLC v. Google LLC et al.*, N.D. Cal. No. 3:22-cv-2746), settled on or before October 31, 2023, and bound only Match Group and Google.

PLAINTIFF'S COMPLAINT

49

170.     Aptoide is not bound by any of the settlements discussed above because it was not an end consumer of the Google Play Store or Google Play Billing, and was not a "US Developer" signatory of the DDA.

## CAUSES OF ACTION

### COUNT I
**Monopoly Maintenance in the Market for Android App Distribution
in Violation of Sherman Act Section 2, 15 U.S.C. § 2
(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

171.     Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

172.     As the jury found in *Epic v. Google*, Google's conduct in the **Android App Distribution Market** violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

173.     As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market.

174.     As the jury found in *Epic v. Google*, Google holds monopoly power in the **Android App Distribution Market**.

175.     Google has unlawfully maintained monopoly power in the **Android App Distribution Market** through the anticompetitive acts described above, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement to provide the Google Play Store with preferential treatment. Google has done this by incentivizing OEMs to enter agreements that prevent alternative app stores from being installed on the default Home Screen of Android devices and coercing OEMs into making the Google Play Store exclusive on their devices, by restricting OEMs from offering frictionless downloading of apps outside of Google Play through compatibility standards in the AFA and ACC, by imposing technical restrictions and obstacles on both OEMs and developers which prevent the distribution of Android apps through means other than the Google Play Store, and by

PLAINTIFF'S COMPLAINT

conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

176.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

177.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

178.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT II**
**Unreasonable Restraints of Trade in the <u>Market for Android App Distribution</u>**
**Relating to OEMs**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

179.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

180.    As the jury found in *Epic v. Google*, Google's conduct with respect to its agreements with OEMs violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

181.    As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market in which Google holds monopoly power.

182.    Google has entered into agreements with OEMs that unreasonably restrict competition in the **Android App Distribution Market**. These include MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

PLAINTIFF'S COMPLAINT

183.    These agreements also include exclusivity agreements that prevent OEMs from pre-installing alternative app stores on a substantial portion of new Android devices, including devices that are sold in markets with the largest monetization opportunities.  Google also has entered agreements that prevent alternative app stores from being installed on the default Home Screen of Android devices.

184.    Through the AFA and ACC compatibility standards, Google restricts OEMs from offering frictionless downloading of apps outside of Google Play.

185.    These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market**.

186.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

187.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

188.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT III**
**Unreasonable Restraints of Trade in the <u>Market for Android App Distribution</u>**
**Relating to the Developer Distribution Agreement (DDA)**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

189.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

190.    As the jury found in *Epic v. Google*, Google's conduct with respect to the DDA violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form

PLAINTIFF'S COMPLAINT

of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

191. As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market in which Google holds monopoly power.

192. Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store. The relevant provisions of these agreements unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market**.

193. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. *See id.* §§ 8.3, 10.3. These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

194. These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market.**

195. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

196. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

PLAINTIFF'S COMPLAINT

197.     As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

### COUNT IV
**Unreasonable Restraints of Trade in the <u>Market for Android App Distribution</u>**
**Relating to Other Agreements with Developers,**
**Including Project Hug, the Games Velocity Program, and the Apps Velocity Program**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

198.     Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

199.     As the jury found in *Epic v. Google*, Defendants' conduct with respect to its agreements with competitors or potential competitors under Project Hug or the Games Velocity Program violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  Defendants' conduct constitutes a *per se* violation of Section 1, and in the alternative, violates Section 1 of the Sherman Act under the rule of reason.

200.     As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market in which Google holds monopoly power.

201.     Google entered into Project Hug agreements, under the Games Velocity Program and Apps Velocity Program, with at least 24 top developers, many or all of whom had either been a vocal agitator about Google's business model or had asked for ways to explore potential opportunities for changes to the business model.  On information and belief, Google has continued negotiating Games Velocity Program and Apps Velocity Program agreements since July 2022.

202.     Google's conduct affects a substantial volume of interstate as well as foreign commerce.

PLAINTIFF'S COMPLAINT

54

203.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, lowered output, and elimination of potential head-to-head competition.

204.     These agreements serve no legitimate or procompetitive purpose sufficient to justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market**.

205.     As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Google's agreements with top developers deprive competing Android app stores, including Aptoide, of inputs critical for success as a competing app distribution platform—for example, exclusive apps, content, or other features from top developers.  These inputs are critical to the ability of competing Android app stores to distinguish themselves from and compete with the Google Play Store.  Aptoide and other existing and potential competitors have been deprived of these inputs because Google has systematically sought to sign a restrictive agreement with any major developer that it identified as at risk of offering its apps on an exclusive basis through another store.  Google has successfully entered into such agreements with at least 24 of the top developers on Android—developers that in Google's estimate represented approximately 30% of all Google Play Store revenue.

206.     Aptoide has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT V**
**Reciprocal Dealing Across the <u>Market for General Search Services</u>**
**and the <u>Market for Android App Distribution</u>**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

207.     Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

208.     Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.

PLAINTIFF'S COMPLAINT

209. As the court found in *Google Search*, the **General Search Services Market** is a valid and distinct antitrust market in which Google holds monopoly power.

210. As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid and distinct antitrust market in which Google holds monopoly power.

211. Google used its monopoly power in the market for **General Search Services** to circumvent competition in the market for **Android App Distribution**. Through its MADAs and RSAs, Google conditioned the availability of significant Google Search revenue share payments to OEMs on those OEMs' agreement to preinstall and preference the Google Play Store on the home page of the mobile devices they manufacture, often on an exclusive basis. This is coercive: for OEMs, forgoing revenue share from Google Search is not economically viable, meaning that they are unable as a result of Google's monopoly in the **General Search Services Market** to enter into agreements with other app distributors that may offer better terms or flexibility in the **Android App Distribution Market**. But for the terms of the MADAs and RSAs, the OEMs would have been free to select app stores to preinstall on their devices on the basis of their price and quality.

212. The court found in *Google Search* that Google has monopoly power in the market for **General Search Services**. Given Google's monopoly power in the market for **General Search Services**, and the substantial effect on commerce in the market for **Android App Distribution**, Google's reciprocal dealing is per se unlawful.

213. In the alternative, Google's reciprocal dealing is unlawful under the rule of reason. There is no valid business necessity or procompetitive justification for this conduct, except to maintain and strengthen Google's monopoly position in the market for **Android App Distribution**. To the extent there are any available non-pretextual justifications for Google's conduct, there exist less restrictive alternatives to achieve any posited justifications, and any such justifications are outweighed by the anticompetitive harms of Google's conduct.

214. Google's conduct substantially forecloses competition in the **Android App Distribution Market**, affecting a substantial volume of commerce in that market.

215. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

PLAINTIFF'S COMPLAINT

56

216.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT VI**
**Reciprocal Dealing Across the <u>Market for Search Advertising</u>**
**and the <u>Market for Android App Distribution</u>**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

217.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

218.    Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.

219.    As the court found in *Google Search*, the **Search Advertising Market** is a valid and distinct antitrust market.

220.    As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid and distinct antitrust market in which Google holds monopoly power.

221.    Google used its market power in the market for **Search Advertising** to circumvent competition in the market for **Android App Distribution**.  Google conditioned the availability of its App Campaigns program—which allowed developers to advertise their apps on Google Search's product results page with a one-tap download for users—on developers' listing their apps in Google Play.  This is coercive: for developers, one-tap downloads on Google Search's results page are an indispensable form of advertising, and regardless of whether other app stores are able to offer better prices and quality on their merits, developers are forced to distribute their apps in Google Play or forego that opportunity for user reach.  But for the terms of the App Campaigns program, developers would have been free to select competing app stores through which to distribute their apps without

PLAINTIFF'S COMPLAINT

being forced to give up any opportunity to meaningfully reach users of Google's monopoly general search product.

222.    The court found in *Google Search* that Google has a durable, over-65% market share in the market for **Search Advertising**, and noted the existence of barriers to entry in that market. Given Google's market power in the market for **Search Advertising**, and the substantial effect on commerce in the market for **Android App Distribution**, Google's reciprocal dealing is per se unlawful.

223.    In the alternative, Google's reciprocal dealing is unlawful under the rule of reason. There is no valid business necessity or procompetitive justification for this conduct, except to maintain and strengthen Google's monopoly position in the market for **Android App Distribution**. To the extent there are any available non-pretextual justifications for Google's conduct, there exist less restrictive alternatives to achieve any posited justifications, and any such justifications are outweighed by the anticompetitive harms of Google's conduct.

224.    Google's conduct substantially forecloses competition in the **Android App Distribution Market**, affecting a substantial volume of commerce in that market.

225.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

226.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT VII**
**Monopolization and Monopoly Maintenance in the <u>Market for Android In-App Billing</u>**
**in Violation of Sherman Act Section 2, 15 U.S.C. § 2**
**(Against All Defendants)**

227.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

PLAINTIFF'S COMPLAINT

228.    As the jury found in *Epic v. Google*, Google's conduct with respect to the **Market for Android In-App Billing** violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

229.    As the jury found in *Epic v. Google*, the **Android In-App Billing Market** is a valid antitrust market.

230.    As the jury found in *Epic v. Google*, Google holds monopoly power in the **Android In-App Billing Market**.

231.    Google has unlawfully acquired monopoly power in these markets, including through the anticompetitive acts described herein.  And however Google initially acquired its monopoly, it has unlawfully maintained its monopoly, including through the anticompetitive acts described herein.

232.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

233.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

234.    As the developer of a competing in-app payment processing solution, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT VIII**
**Unreasonable Restraints of Trade in the <u>Market for Android In-App Billing</u>**
**Relating to the Developer Distribution Agreement (DDA)**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against All Defendants)**

235.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

PLAINTIFF'S COMPLAINT

236. As the jury found in *Epic v. Google*, Google's conduct with respect to DDAs violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

237. As the jury found in *Epic v. Google*, the **Android In-App Billing Market** is a valid antitrust market in which Google holds monopoly power.

238. Defendants, except Google Payment, force app developers to enter into its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, the Google Play Store. The relevant provisions of these agreements unreasonably restrain and substantially foreclose competition in the **Android In-App Billing Market**.

239. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use [Google Play In-app Billing, offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "primarily . . . physical" goods and services or of digital content that may be consumed outside of the app itself, Google expressly applies its anticompetitive mandate to all "Play-distributed apps . . . if they require or accept payment for access to features or services, including any app functionality, digital content or goods."

240. The challenged provisions serve no sufficient legitimate or procompetitive purpose and unreasonably restrain and substantially foreclose competition in the **Android In-App Billing Market**.

241. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

PLAINTIFF'S COMPLAINT

242. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

243. As the developer of a competing in-app payment processing solution, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT IX**
**Tying Google Play Store in the <u>Market for Android App Distribution</u>**
**to Google Play Billing in the <u>Market for Android In-App Billing</u>**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**(Against All Defendants)**

244. Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

245. As the jury found in *Epic v. Google*, Google's conduct with respect to tying the Google Play Store to Google Play Billing violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

246. Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

247. As the jury found in *Epic v. Google*, Google has monopoly power in the tying market, the **Android App Distribution Market**. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's monopoly power is further evidenced by its ability to extract supracompetitive taxes on the sale of apps through the Google Play Store.

248. The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing solution. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing solution to the exclusion of competing in-app payment processing solutions like

PLAINTIFF'S COMPLAINT

Aptoide's, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

249.    The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed.  Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

250.    Google's conduct substantially forecloses competition in the **Android In-App Billing Market**, affecting a substantial volume of commerce in this market.

251.    Google has thus engaged in a per se illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

252.    In the alternative only, even if Google's conduct does not constitute a per se illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

253.    As the developer of a competing in-app payment processing solution, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

**COUNT X**
**Unreasonable Restraints of Trade in the <u>Market for Android App Distribution</u>**
**Relating to OEMs**
**in Violation of the California Cartwright Act**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

254.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

255.    As the jury found in *Epic v. Google*, Google's conduct with respect to its agreements with OEMs violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits,

PLAINTIFF'S COMPLAINT

*inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

256.    As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market in which Google holds monopoly power.

257.    Google has entered into agreements with OEMs that unreasonably restrict competition in the **Android App Distribution Market**. These include MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

258.    These agreements also include exclusivity agreements that prevent OEMs from pre-installing alternative app stores on a substantial portion of new Android devices, including devices that are sold in markets with the largest monetization opportunities. Google also has entered agreements that prevent alternative app stores from being installed on the default Home Screen of Android devices.

259.    Through the AFA and ACC compatibility standards, Google restricts OEMs from offering frictionless downloading of apps outside of Google Play.

260.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

261.    These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market**.

262.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

263.    It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be

PLAINTIFF'S COMPLAINT

governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XI**
**Unreasonable Restraints of Trade in the <u>Market for Android App Distribution</u>**
**Relating to the Developer Distribution Agreement (DDA)**
**in Violation of the California Cartwright Act**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

264. Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

265. As the jury found in *Epic v. Google*, Google's conduct with respect to the DDA violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

266. As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid antitrust market in which Google holds monopoly power.

267. Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store. The relevant provisions of these agreements unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market**.

268. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [i.e., code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and

PLAINTIFF'S COMPLAINT

64

to terminate the DDA on these bases. *See id.* §§ 8.3, 10.3. These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

269. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

270. These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the **Android App Distribution Market.**

271. As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

272. It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XII**
**Reciprocal Dealing Across the <u>Market for General Search Services</u>**
**and the <u>Market for Android App Distribution</u>**
**in Violation of the California Cartwright Act**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

273. Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

274. Google's conduct violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

PLAINTIFF'S COMPLAINT

275. As the court found in *Google Search*, the **General Search Services Market** is a valid and distinct antitrust market in which Google holds monopoly power.

276. As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid and distinct antitrust market in which Google holds monopoly power.

277. Google used its monopoly power in the market for **General Search Services** to circumvent competition in the market for **Android App Distribution**. Through its MADAs and RSAs, Google conditioned the availability of significant Google Search revenue share payments to OEMs on those OEMs' agreement to preinstall and preference the Google Play Store on the home page of the mobile devices they manufacture, often on an exclusive basis. This is coercive: for OEMs, forgoing revenue share from Google Search is not economically viable, meaning that they are unable as a result of Google's monopoly in the **General Search Services Market** to enter into agreements with other app distributors that may offer better terms or flexibility in the **Android App Distribution Market**. But for the terms of the MADAs and RSAs, the OEMs would have been free to select app stores to preinstall on their devices on the basis of their price and quality.

278. The court found in *Google Search* that Google has monopoly power in the market for **General Search Services**. Given Google's monopoly power in the market for **General Search Services**, and the substantial effect on commerce in the market for **Android App Distribution**, Google's reciprocal dealing is per se unlawful.

279. In the alternative, Google's reciprocal dealing is unlawful under the rule of reason. There is no valid business necessity or procompetitive justification for this conduct, except to maintain and strengthen Google's monopoly position in the market for **Android App Distribution**. To the extent there are any available non-pretextual justifications for Google's conduct, there exist less restrictive alternatives to achieve any posited justifications, and any such justifications are outweighed by the anticompetitive harms of Google's conduct.

280. Google's conduct substantially forecloses competition in the **Android App Distribution Market**, affecting a substantial volume of commerce in that market.

281. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

PLAINTIFF'S COMPLAINT

282.    As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

283.    It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XIII**
**Reciprocal Dealing Across the <u>Market for Search Advertising</u>**
**and the <u>Market for Android App Distribution</u>**
**in Violation of the California Cartwright Act**
**(Against Google LLC, Google Ireland, Google Commerce, and Google Asia Pacific)**

284.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

285.    Google's conduct violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

286.    As the court found in *Google Search*, the **Search Advertising Market** is a valid and distinct antitrust market.

287.    As the jury found in *Epic v. Google*, the **Android App Distribution Market** is a valid and distinct antitrust market in which Google holds monopoly power.

288.    Google used its market power in the market for **Search Advertising** to circumvent competition in the market for **Android App Distribution**.  Google conditioned the availability of its App Campaigns program—which allowed developers to advertise their apps on Google Search's product results page with a one-tap download for users—on developers' listing their apps in Google Play.  This is coercive: for developers, one-tap downloads on Google Search's results page are an

PLAINTIFF'S COMPLAINT

indispensable form of advertising, and regardless of whether other app stores are able to offer better prices and quality on their merits, developers are forced to distribute their apps in Google Play or forego that opportunity for user reach. But for the terms of the App Campaigns program, developers would have been free to select competing app stores through which to distribute their apps without being forced to give up any opportunity to meaningfully reach users of Google's monopoly general search product.

289. The court found in *Google Search* that Google has a durable, over-65% market share in the market for **Search Advertising**, and noted the existence of barriers to entry in that market. Given Google's market power in the market for **Search Advertising**, and the substantial effect on commerce in the market for **Android App Distribution**, Google's reciprocal dealing is per se unlawful.

290. In the alternative, Google's reciprocal dealing is unlawful under the rule of reason. There is no valid business necessity or procompetitive justification for this conduct, except to maintain and strengthen Google's monopoly position in the market for **Android App Distribution**. To the extent there are any available non-pretextual justifications for Google's conduct, there exist less restrictive alternatives to achieve any posited justifications, and any such justifications are outweighed by the anticompetitive harms of Google's conduct.

291. Google's conduct substantially forecloses competition in the **Android App Distribution Market**, affecting a substantial volume of commerce in that market.

292. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

293. As a competing app distributor, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

294. It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be

PLAINTIFF'S COMPLAINT

governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XIV**
**Unreasonable Restraints of Trade in the <u>Market for Android In-App Billing</u>**
**Relating to the Developer Distribution Agreement (DDA)**
**in Violation of the California Cartwright Act**
**(Against All Defendants)**

295.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

296.    As the jury found in *Epic v. Google*, Google's conduct with respect to the DDA violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

297.    As the jury found in *Epic v. Google*, the **Android In-App Billing Market** is a valid antitrust market in which Google holds monopoly power.

298.    Defendants, except Google Payment, force app developers to enter into its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, the Google Play Store.  The relevant provisions of these agreements unreasonably restrain and substantially foreclose competition in the **Android In-App Billing Market**.

299.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases of digital content.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use [Google Play In-app Billing, offered by Google Payment] as the method of payment" for such in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "primarily . . . physical" goods

PLAINTIFF'S COMPLAINT

and services or of digital content that may be consumed outside of the app itself, Google expressly applies its anticompetitive mandate to all "Play-distributed apps . . . if they require or accept payment for access to features or services, including any app functionality, digital content or goods."

300. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

301. The challenged provisions serve no sufficient legitimate or procompetitive purpose and unreasonably restrain and substantially foreclose competition in the **Android In-App Billing Market**.

302. As the developer of a competing in-app payment processing solution, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury. Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

303. It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XV**
**Tying Google Play Store in the <u>Market for Android App Distribution</u>**
**to Google Play Billing in the <u>Market for Android In-App Billing</u>**
**in Violation of the California Cartwright Act**
**(Against All Defendants)**

304. Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

305. As the jury found in *Epic v. Google*, Google's conduct with respect to tying the Google Play Store to Google Play Billing violates the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

PLAINTIFF'S COMPLAINT

70

306. Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

307. As the jury found in *Epic v. Google*, Google has monopoly power in the tying market, the **Android App Distribution Market**. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's monopoly power is further evidenced by its ability to extract supracompetitive taxes on the sale of apps through the Google Play Store.

308. The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing solution. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing solution to the exclusion of competing in-app payment processing solutions like Aptoide's, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

309. The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

310. Google's conduct substantially forecloses competition in the **Android In-App Billing Market**, affecting a substantial volume of commerce in this market.

311. Google has thus engaged in a per se illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

312. In the alternative only, even if Google's conduct does not constitute a per se illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

PLAINTIFF'S COMPLAINT

313.    As the developer of a competing in-app payment processing solution, Aptoide has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Aptoide has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury.  Such damages and injury will not be redressed until the relief requested in this lawsuit issues.

314.    It is appropriate to bring this action under the Cartwright Act in addition to the Sherman Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

**COUNT XVI**
**Unlawful Conduct**
**In Violation of California Unfair Competition Law (UCL)**
**(Against All Defendants)**

315.    Aptoide incorporates by reference all preceding paragraphs and the allegations contained therein.

316.    Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

317.    Aptoide has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, Aptoide develops a competing app store and offers in-app billing services on the Android mobile platform.  Google's conduct has unreasonably restricted Aptoide's ability to fairly compete in the relevant markets with these products.

318.    As the jury found in *Epic v. Google*, Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

319.    Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

PLAINTIFF'S COMPLAINT

72

320.   Google's conduct harms Aptoide which, as a direct result of Google's anticompetitive conduct, is unreasonably prevented from competing on the merits of its app store or freely offering its in-app payment processing tool, and forfeits the revenue from both products' competition in a competitive market.

321.   Aptoide seeks injunctive relief under the Unfair Competition Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Aptoide and against Defendants:

  a. Awarding monetary damages, including treble damages, together with the expenses of litigation and costs of this action, including attorneys' fees and expenses;

  b. Awarding pre- and post-judgment interest;

  c. Awarding restitution;

  d. Adjudging and decreeing that the contractual restraints complained of herein are unlawful and unenforceable;

  e. Issuing an injunction prohibiting Google from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose and effect as the challenged practices;

  f. Entering any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Google's unlawful conduct; and

  g. Entering any additional relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Aptoide hereby demands a trial by jury on all issues so triable.

PLAINTIFF'S COMPLAINT

Dated: April 14, 2026                    Respectfully submitted,


                                         /s/ Andrew Chang

                                         Aaron Teitelbaum (SBN 298135)
                                         Andrew Chang (SBN 319009)
                                         KRESSIN POWERS LLC
                                         400 7th St. NW, Suite 300
                                         Washington, DC 20004
                                         Telephone: (202) 922-5962
                                         Fax: (202) 998-9319
                                         Email: aaron@kressinpowers.com
                                         Email: andrew@kressinpowers.com

                                         *Counsel for Plaintiff Aptoide, S.A.*

PLAINTIFF'S COMPLAINT